[No. H021384. Sixth Dist. Feb. 5, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
HENRY GONZALES ESPINOZA, Defendant and Appellant.

[No. H022532. Sixth Dist. Feb. 5, 2002.]

In re HENRY GONZALES ESPINOZA on Habeas Corpus.

**COUNSEL**

Alex Green, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Christopher W. Grove and Sharon G. Birenbaum, Deputy Attorneys General, for Plaintiff and Respondent.

Adrienne M. Grover, County Counsel, J. Michael Hogan and William K. Rentz, Deputy County Counsel, for Monterey County Department of Social Services as Amicus Curiae on behalf of Plaintiff and Respondent.

**OPINION**

MIHARA J.—Defendant was convicted after a court trial of four counts of lewd conduct on a child (Pen. Code, § 288, subd. (a)), one count of forcible lewd conduct on a child (Pen. Code, § 288, subd. (b)) and one count of attempted forcible rape (Pen. Code, §§ 261, subd. (a)(2), 664). He was committed to state prison for a term of eight years. On appeal, he claims that his due process rights were violated by the trial court's exclusion of (1) evidence that the victim had made a prior false allegation of molest, (2) testimony by a defense psychiatrist regarding the victim's credibility and (3) testimony by the victim's foster mother regarding the victim's credibility. He also asserts that the evidence was insufficient to support a finding of force or duress as to the forcible lewd conduct count or the attempted forcible rape count. In an accompanying petition for writ of habeas corpus, defendant asserts that he is entitled to a new trial because he has recently discovered evidence which undermines the prosecution's case.

We conclude: (1) defendant never proffered evidence that the victim's prior accusation was false, (2) the proffered expert psychiatric evidence was

inadmissible and its exclusion did not violate defendant's due process rights, (3) Welfare and Institutions Code section 827 did not justify exclusion of the foster mother's testimony but its exclusion was not a violation of defendant's right to due process and did not prejudice him, (4) there was insufficient evidence of duress and (5) his petition is meritless. We therefore modify and affirm the judgment and deny the petition.

*Facts*

In early April 1999, defendant and his father drove to Nebraska from California and picked up defendant's three daughters L., J. and A. and their elder half sister M. from their mother to bring the girls to live with him in Salinas. L. and J. wanted to come live with defendant because they "missed him." Defendant had promised to take them to Disneyland and Knott's Berry Farm. Their half sister M. went to live with a friend initially and then with defendant's sister. M. did not live with defendant because defendant had molested M. three times between 1988 and 1990. When M.'s mother had confronted defendant about M.'s allegations at the time, defendant said he had molested her because she "was not his." Defendant had been prosecuted and convicted of molesting M. When he came to pick up the girls in April 1999, defendant got on his knees, cried and asked their mother to forgive him for molesting M. Defendant claimed that he had "changed," that he was attending church and that he "would never do that again." Before defendant left Nebraska with the girls, their mother told him that L. had been molested by L.'s uncle in Nebraska. Defendant had no reaction to this disclosure.

L. knew that defendant had molested M., but M. never spoke to L. about the molestations. In April 1999, L. was 12 years old and in special education classes at school. She was "a loner" even amongst her sisters. L. was not as "bright" as her sisters and often had trouble concentrating. The girls arrived in Salinas with defendant on April 10. L. started school in Salinas on Thursday, April 15. Defendant's sister noticed when defendant brought the girls to visit her that L. "seemed to stay away" from defendant.

L. and her sisters shared a bedroom in defendant's apartment, but her sisters often slept in defendant's bedroom.[1] L. never slept in defendant's bedroom. When L. was sleeping in her bedroom alone, defendant would come into the room in the wee hours of the morning when it was very dark

---

[1] J. testified that she could not remember how many times she and A. slept in defendant's bedroom. She thought it was "[l]ike two times a week." She could not remember how many weeks they lived with defendant.

and molest her. Defendant molested her on five occasions.[2] On at least one occasion defendant turned on the lights before he molested her. On four occasions, defendant sat on the bed, pulled her pants down and rubbed her breasts and vagina underneath her clothes with his hands. This rubbing "felt uncomfortable" to L. but not painful. L. was "too scared to do anything" when defendant was molesting her. She was "[v]ery scared" and "frightened."

Because L. was afraid that defendant "would come and do something" if she reported the molests, she was reluctant to report them to an adult. On Friday, April 23, 1999, while at school, L. told her two young friends Norma and Veronica that defendant had been molesting her. She told them that defendant was coming into her room about 3:00 a.m. and touching her private parts. Her friends urged her to report the molests, but she told them she was "scared" that defendant "would do something to her if she would go and tell." L. told Veronica that she was "scared" of defendant and "scared to go home." She asked Veronica if she could go live with her. Veronica said she would ask her mom. L. told her friends that she would think over the weekend about reporting the molests.

The fifth and final molestation occurred in the early morning hours on April 25 or 26. On this occasion, he not only rubbed her body but he also put his tongue in her mouth, licked her vagina and tried to put his penis in her vagina.[3] L. could feel "[s]omething going in me." L. "moved" to prevent defendant's penis from going inside her. She felt something wet on her sheets. Defendant then apologized and asked her to forgive him. L. said nothing. Afterwards, L. saw "[s]ome liquid stuff" on her sheets. L. got up and looked at a clock, and it was between 2:00 a.m. and 3:00 a.m. When defendant returned from work that morning to take the girls to school as he usually did, he removed the sheets from L.'s bed and washed them.

On Monday, April 26, L.'s friends reiterated their concerns and L. reluctantly agreed to report the molests. L. then reported the molests to a school counselor. The police and child protective services were notified, and a police officer and social worker Michelle O'Brien came to the school. L. spoke to both the police officer and O'Brien and told them that defendant had molested her five times in the last two weeks.

---

[2] L. testified that there were five or six molests but she was sure that there were five molests.

[3] During cross-examination at trial, L. testified that he had rubbed her body, put his tongue in her mouth and licked her vagina. When defendant's trial counsel asked if defendant did "[a]nything else," L. said "No." However, later in cross-examination, she described defendant's attempt to have intercourse with her.

The school contacted defendant's sister, and she came to the school. While defendant's sister was at the school, defendant paged her. She telephoned him. Defendant told his sister that L. had made a child molest allegation and he believed the molest had happened in Nebraska. Defendant asked his sister to come pick up L.'s sister A. from his apartment because "he had things he needed to do." Defendant's sister went to his apartment. Defendant was packing L.'s and her sisters' clothing. It looked as if the clothes had been freshly laundered. Defendant's sister observed that there was no bedding on the girls' bed. It was just a bare mattress. Defendant told her that he "thought it was best that they stay with me until things mulled over." He said that he had gone to pick up L. and J. from school and had been told that J. would not be coming home with him. He was asked to wait a minute, but he left the school immediately. Defendant also told her that "you know, mom and Mary warned me about this; you know, that this would happen if I brought the girls here. I should have listened to them." Defendant's sister took A. and the packed clothing away from defendant's apartment, and defendant said he would send along the rest of the girls' possessions later. Defendant told his sister that he "was just going to sit there and wait."

L. was transported to the child advocacy center where she was interviewed by Susan Gleason. A transcript of Gleason's interview with L. was admitted at trial. L. told Gleason that she had previously been molested by her uncle. She said that her uncle had touched her private parts "the same that my dad did." It had taken her "a long time" to report the uncle's molestations, but the molestations ended when she reported them. L. told Gleason that her sisters did not believe her about the Nebraska molestations.

L. stated that defendant had begun molesting her "in the middle of like last week, I think." L. also reported that defendant had begun molesting her on the third or fourth day that she attended school after moving in with defendant. He molested her five or six times in a period of less than two weeks. The events did not occur every night. L. said that defendant usually went to work at 2:00 or 3:00 a.m. and then returned to take her and her sisters to school. Defendant's molestations of her generally occurred before he went to work on mornings when L.'s sisters were sleeping in defendant's bedroom rather than in the bedroom L. otherwise shared with her sisters. When the first molest occurred, she awoke to find defendant lying or sitting on her bed touching her arms, legs and private parts. L. was "really scared" and "didn't know what to do" so she "just stayed there" and defendant "kept on touching" her. Defendant had not removed her clothing but instead had pulled up her nightshirt, pulled down her underwear and slipped his hand inside her bra.

Defendant only spoke to her during one of the molests. He said "Do you still love me" and then repeatedly said "Please love me" and possibly cried. She initially reported that the most recent event had occurred "last night" when defendant "tried to put his thing in me." When defendant did this, it hurt L. After he did this, L. noticed a wet substance on her clothing and on the sheets. A little later in the interview, L. stated that this most recent event had not happened "this morning" but "yesterday morning." L. told Gleason that she was "very worried about her own safety in going home."

L. was unwilling to consent to an internal examination of her genitalia by a physician, but she did consent to a "visual exam" so long as no instruments were placed inside of her. The physician found no physical evidence of molestation.

A police officer attempted to make contact with defendant at defendant's apartment on April 26 and April 27. None of defendant's vehicles were parked in the vicinity, and the officer was unable to locate defendant. The officer also checked at defendant's place of employment but had no luck in locating defendant there. The officer "made out a BOL broadcast" asking other officers to be on the lookout for defendant.

Defendant's sister returned to defendant's apartment on Saturday, May 1 and retrieved the rest of the girls' possessions. Defendant was at the apartment at the time.

Defendant was arrested on May 27, 1999 and charged by information with four counts of lewd conduct on a child (Pen. Code, § 288, subd. (a)), one count of forcible lewd conduct on a child (Pen. Code, § 288, subd. (b)) and one count of attempted forcible rape (Pen. Code, §§ 261, subd. (a)(2), 664).

The girls stayed with defendant's sister for three months and then were placed in foster care. L. never spoke to defendant's sister about the molestations. Defendant's sister was "having some difficulty" with L. and "at the back of her mind" was a concern that her son or husband might be accused of sexual misconduct with her. This concern arose from defendant's sister's uncertainty about how to help L. deal with "some issues." She also felt that she could not give the girls "the love and the attention that they needed." Defendant's sister did not believe that L. would "[m]ake things up" or "try to draw attention" to herself any more than defendant's sister's own children.

In December 1999, the prosecution filed a motion seeking permission to have L. testify by closed circuit television. Because this motion was based on L.'s psychiatric condition, L.'s medical and psychiatric records were

released to the defense. In January 2000, defendant waived his right to a jury trial in exchange for an agreement that, if convicted, he would be sentenced to no more than eight years in state prison. The court trial was scheduled for February 7, 2000. The prosecutor made an in limine motion to exclude possible defense evidence under Evidence Code section 352 that it argued might be used as part of an "attempt to 'trash' " L. The prosecutor also sought exclusion of any evidence of L.'s "sexual acting out" under Evidence Code sections 352, 765, subdivision (b) and 782. In addition, an in limine ruling was requested by the prosecutor on the admissibility of evidence of L.'s "psychological disorder" of posttraumatic stress disorder (PTSD) as "corroboration" of the molestations. During discussion of the prosecution's in limine motions, defendant's trial counsel disavowed any intent to introduce evidence of L.'s "sexual conduct" unless it was relevant to a social worker's opinion. He also stated that he did not intend to cross-examine L. about her prior allegation of molest against her uncle.

Defendant's sister testified at trial that defendant had molested her from when she was five years old until she was 11 or 12 years old. These molestations occurred about three times a week. Most of these molests involved defendant touching his sister's private parts and masturbating himself. On at least one occasion, he orally copulated her. She had not disclosed these molests to her mother until she was 14 years old. Defendant's sister also testified that she had seen defendant molesting two of his cousins.

Defendant's trial counsel was allowed to question J. at trial about J.'s opinion of L.'s truthfulness. J. testified "I think she was telling the truth" about being molested by defendant. J. admitted that she had not believed L. about the Nebraska molestations because "she made up a lot of stories" which "kind of made me not believe her." On redirect, J. clarified that L. had told her of the Nebraska molestations in "different pieces" rather than telling her "the whole thing at once" which caused J. to disbelieve L. regarding those molestations. J. no longer disbelieved L. about the Nebraska molestations.

Notwithstanding his earlier disavowal, shortly before the prosecution rested, defendant's trial counsel filed a motion seeking admission of evidence of L.'s "sexual conduct" and asserting that such evidence would be relevant to L.'s credibility. This motion was denied.

Defendant testified on his own behalf at trial and presented the testimony of his mother and the two cousins his sister had testified he had molested. His two cousins denied that he had molested them. His mother testified that

she had spoken with L. by telephone on the morning of Saturday, April 24, and L. said she was fine and wanted to stay with defendant even though her sisters wanted to go back to their mother.

Defendant testified on direct examination that L.'s mother had told him of the Nebraska molestation a month or two before he picked up the girls in April 1999. He admitted that the girls slept in his room on two to four occasions during the first week they lived with him, but he claimed that L. was one of those sleeping in his room on some of those occasions and that this activity ended after the first week, when he installed a lock on his bedroom door and told the girls to sleep in their own room. Defendant also testified that his girlfriend Lola Lujan,[4] whom he considered his wife, had lived with him before he went to retrieve the girls, but he told Lujan she would have to move out if she was going to continue to use drugs. She moved out before the girls arrived, but she visited defendant a couple of days after the girls arrived. Defendant claimed that Lujan returned to his apartment on the evening of Sunday, April 25 and spent the night with him in his bedroom that night. A few days later, Lujan returned to live with him.

Defendant categorically denied molesting L. He asserted that on April 26, when he went to pick up L. and J. from school, he was told by someone at the school "that there was some allegations made and something to do with CPS." No additional information was provided, and he left and went back to his apartment with A. He claimed that he had only learned that L. had accused him of molesting her when his sister called him back in response to his page. It was only after she disclosed that information that he asked her to come pick up A.

Defendant admitted that he had done some laundry on the morning of April 26, but he denied having removed any bedding from any beds or washing any bedding. He claimed that the girls' bed still had its bedding on April 26. Defendant also denied fleeing or secreting himself, and maintained that he was either at his apartment or out working the rest of the day on April 26 and on the following days.

On cross-examination, defendant said that he had not learned that L. had accused him of molesting her until his sister arrived at his apartment to pick up A. He then changed his answer and said his sister might have mentioned it on the telephone but he could not recall. Defendant conceded that *he* "might have" told his sister that L. had reported a molest at school that had

---

[4]The appellate record indicates that defendant's girlfriend's name was Lola Lujon or Lola Ancira, but her declaration in support of his petition for a writ of habeas corpus reflects that her name is Lola Lujan. For consistency's sake, we will refer to her as Lola Lujan.

actually occurred in Nebraska. He also testified that he had not learned the source of the allegations while he was at the school waiting for L. and J. but only that J. did not want to come home with him. Instead, he *assumed* it was L. making the allegations because of his knowledge of the Nebraska molestation allegations she had made. He also assumed that the molestation she was reporting was the Nebraska molestation by her uncle. He claimed that he did not learn that L. was accusing *him* of molesting her until he talked to his mother *after his sister left with A.*

Defendant testified that he had never known L. to be dishonest in the past, and he believed her accusation regarding her uncle. He could not come up with any reason why L. would falsely accuse him of molesting her other than his speculation that his failure to speedily provide a dog for the girls had disappointed them. However, the failed attempt to get a dog happened on the weekend *after* L. reported the molestations to her two young friends.

Defendant admitted that he had molested his sister, but he claimed that the molestations involved only fondling and ended when he was 12 years old and she was 4 years old. He denied molesting M., but he admitted that he had been convicted of molesting M. Defendant also admitted that he had lied under penalty of perjury in various documents by stating that Lujan was his wife and by claiming that he was supporting the girls after they had gone to live with his sister.

On redirect, defendant claimed that he thought L. was dishonest because her mother had told him that she was rebellious and did not like school and her sisters had told him that L. talked back and caused problems.

The court found all of the counts and allegations true, and it made an extensive statement of its findings and reasoning. "This case, like many others with similar allegations, comes down to a question of assessing the credibility of the complaining witness, L[.], against the credibility of, in this case, the defendant, who testified, and all the other defense evidence that was offered. [¶] In examining L[.]'s credibility, her demeanor as she testified was, in my view, appropriate. [¶] Her attitude towards the action was— towards the lawsuit was appropriate. She was serious. It was clear to me that she understood the importance of the proceedings and she understood the oath that she had taken to tell the truth. [¶] In looking at her capacity to perceive or to communicate or to recollect, her capacity to perceive events, in my view, was not impaired. And I'm saying this, recognizing that she is a special education student, that she clearly was somewhat afraid of simply being in the courtroom and testifying." The court noted that L. had an "imperfect ability to communicate" but concluded that she was able to distinguish fact from fantasy.

"In reviewing her credibility I keep coming back to what, if anything, would have caused her to make a false accusation against her father, what bias might she have had, what motive, particularly, might she have had for falsifying an accusation of this nature. [¶] Based on all the evidence I cannot find that she had any motive to lie." "There was no benefit to be gained by L[.] in telling a false story and making up a false accusation that her father molested her. She had gone through part of the process in Nebraska, having made the accusation about her uncle, she was required to go to the hospital and have a physical exam, which she refused. She must have understood the consequences that making an allegation against her father, the same process, or somewhat of the same process, would occur, there would be another medical exam, more unpleasantness. Despite that, she made the disclosures that she did. [¶] She clearly wasn't making them to gain attention, in my mind." "She didn't appear to me to be exaggerating when she testified in court. Her world crumbled when she made these disclosures. And all of that supports her credibility." The court found that L.'s testimony was strongly corroborated by (1) the fact that she described defendant apologizing and seeking forgiveness much as he had apologized and sought forgiveness for his molestation of M. and (2) his molestations of his sister and M. Defendant's lies under penalty of perjury showed that "he is not a truthful person, and that he is willing to lie. And I did not believe his testimony in this trial."

Defendant was committed to state prison for the upper term of eight years on one of the Penal Code section 288, subdivision (a) counts, concurrent upper terms of eight years for each of the remaining Penal Code section 288 counts, including the Penal Code section 288, subdivision (b) count, and a concurrent upper term of four years for the attempted rape count. Defendant filed a timely notice of appeal.

*Discussion*

## I. *Appeal*

### A. *Exclusion of Evidence*

Defendant asserts that his due process rights were violated by the trial court's exclusion of (1) evidence that L. had falsely accused her uncle of molesting her, (2) proposed testimony by a defense psychiatrist and (3) proposed testimony by L.'s foster mother regarding L.'s credibility.

#### 1. *L.'s prior accusation*

##### a. *Background*

Defendant's trial counsel's trial brief and witness list did not include any mention of testimony by the alleged perpetrator of any prior molestation of

L. During in limine discussions, defendant's trial counsel disavowed any intent to introduce evidence of L.'s "sexual conduct" or to cross-examine L. about her prior allegation of molest against her uncle. A Nebraska sheriff's department report regarding L.'s allegation against her uncle Jaime Murillo, which the prosecutor had provided to the defense, indicated that her uncle had been molesting her for two years at the time she reported his molestations of her. The report also stated that Murillo had admitted to the police that he had fondled L.

During trial, defendant's trial counsel disclosed that he had recently received a note from the attorney who had represented Murillo indicating that the case had been dismissed because L. had refused to come to court to testify. This attorney had also told defendant's trial counsel that the alleged molestation had been a one-time event rather than a two-year-long series of molestations. Defendant's trial counsel stated that his receipt of this information was "likely" to change his position with regard to the admission of evidence of L.'s sexual conduct under Evidence Code section 782. Defendant's trial counsel sought a continuance. The prosecutor opposed this request. She argued that defendant's trial counsel had been well aware of the Nebraska incident long before trial. The court denied the continuance request.

During his cross-examination of L., defendant's trial counsel asked her if she had accused someone of molesting her in Nebraska "two years ago." L. responded "Yes," and the prosecutor objected on the ground that this questioning was beyond the scope of direct and improper because there had been no motion under Evidence Code section 782. The court overruled the objections. L. then testified that the person she had accused was her uncle and that she had never been asked to go to court regarding that accusation and therefore had never "refused" to go to court. Defendant's trial counsel also elicited L.'s testimony that she was concerned that her sisters would not believe her about defendant's molestation of her because they had not believed her about her uncle's molestation of her.

On direct examination of L.'s mother, the prosecutor elicited her testimony that she had told defendant, before he left Nebraska with the girls, that L. had been molested by L.'s uncle in Nebraska. L.'s mother also testified that it had taken L. a long time to disclose the molestation by her uncle. On cross-examination, defendant's trial counsel elicited L.'s mother's testimony that L. had refused to consent to a medical examination after she reported the molestation by her uncle. L.'s mother also testified on cross-examination that she, not L., had told the Nebraska prosecutor that she did not want the uncle prosecuted. She also testified that L. had disclosed the Nebraska

molestation to her sisters first and then to her aunt, Murillo's wife. L.'s mother learned of the molestations from the aunt, L's mother's sister. On redirect, L.'s mother confirmed that she had asked the Nebraska prosecutor to dismiss the charges against the uncle because the aunt had asked her to do so. During his cross-examination of M., defendant's trial counsel elicited her testimony that L. had reported the Nebraska molestation to her in January 1998. L. told M. that their uncle had molested her early that morning.

On February 22, shortly before the prosecution rested, defendant's trial counsel filed a motion under Evidence Code sections 780 and 782 seeking admission of evidence of L.'s "sexual conduct" and asserting that this evidence would be relevant to her credibility.[5] The motion sought admission of evidence of various incidents of alleged sexual acting out behavior of L. (all supported by a declaration by defendant's trial counsel on information and belief) and asserted that defense psychiatrist Dr. Joseph Greene would testify essentially that L.'s sexual acting out behavior showed that she had been a victim of long-term sexual abuse that had destroyed her ability to distinguish between fact and fantasy and the past and present making her "an unreliable reporter" of sexual abuse. Defendant's trial counsel's declaration in support of the motion also mentioned the Nebraska allegation and stated "I have been informed and therefore believe that JAIME MURILLO denied the allegation made by [L.]"

In arguing his motion, defendant's trial counsel first asserted "I don't wish to retry [the Nebraska case]." However, he stated that he was "willing" to present testimony by the prosecutor in that case that the case was dismissed because the prosecutor had been told by someone else that L.'s mother and L. "made it very clear" that they did not want to come to court. Although he initially claimed that it was "[a] very important fact" that the police officers who had spoken with Murillo in Nebraska had not spoken Spanish and Murillo did not speak English, moments later he characterized this fact as "collateral" and disclaimed any intent to present evidence on that point. "[Murillo] was prepared to come to court and say that he did not make any such confession that night or any other time, and he was never questioned in Spanish by anybody. That gets to be somewhat collateral, and I don't really wish to try that because that does not—whether he speaks Spanish or not doesn't go to the truthfulness of this witness. I admit that. That's what I'm trying to stay away from, retrying that case, but but [*sic*] I think her sexual acting out behaviors over a period of time [justifies admission of Greene's testimony]."

---

[5]At the same time, he provided the court and the prosecutor with a document in Spanish that he asserted he had received from "Miguel Suarez" in Nebraska. Defendant's trial counsel asserted that he intended to call "Miguel Suarez" to testify about his observations of some alleged "sexual acting out behavior" of L.

In opposition to the motion, the prosecutor argued that evidence of the Nebraska molestation accusation was not admissible because there was no evidence that L.'s accusation was *false*. She also argued that the Nebraska accusation was not similar to the allegations against defendant because the allegations against defendant were corroborated. Because the defense claimed that the Nebraska allegation was a false accusation, the court concluded that this evidence was not a proper subject for a motion under Evidence Code section 782. The court determined that the other alleged incidents of sexual acting out behavior were not relevant to L.'s credibility and therefore were not admissible.

In his closing argument, defendant's trial counsel conceded that the evidence that had been presented showed that the Nebraska allegation had been truthful. He asserted that the Nebraska molestations had caused L. to suffer from PTSD or some more severe mental disorder that caused her to have "a flashback" in Salinas that led her to accuse defendant of molesting her. He suggested that L. was "mixing up the incidences." Defendant's trial counsel also argued that it did not matter whether the Nebraska allegation was true or false "[b]ecause it works either way." "If on the one hand she made a false allegation there, that is an important factor in this Court's determining her credibility in this instance. If in fact it did happen, with the evidence we have about [PTSD] and her severe depression, it does have an impact on this Court's determination. However you look at it, whatever happened in Nebraska actually does have something to do with this Court's determining her credibility. [¶] We may never be able to determine the truth or falsity of the accusation there, even if we had a trial on that issue. And I don't wish to do that. I don't wish to go to Nebraska to do it, and I don't wish those people to come here to do it."

Defendant's trial counsel also argued that L.'s initial reluctance to come to court and testify suggested that she was not telling the truth and was trying to avoid lying under oath. He repeatedly complained about not having been allowed to present further psychiatric evidence. He even asked the court to reopen the case and allow him to present such evidence.

At the sentencing hearing, defendant's trial counsel complained that he had not been permitted to present evidence at trial that would have shown that the Nebraska allegation was false. He claimed that evidence of the alleged timing of the molestation would have demonstrated that it could not have been committed since the uncle was at work at the time.

b. *Analysis*

Defendant's appellate argument on this issue is specious. He concedes that the court correctly ruled that evidence that L. had made a prior false

accusation was not admissible under Evidence Code section 782, yet he argues that the trial court abused its discretion in so ruling. He asserts that the trial court prevented him from presenting "additional evidence" that L. had falsely accused her uncle of molesting her in Nebraska, but he does not explicitly detail the nature of the excluded evidence in his opening brief or cite to any ruling excluding such proffered evidence.

■ It is only in his reply brief that defendant finally clarifies that he is arguing on appeal that the trial court precluded him from presenting Murillo as a witness to deny L.'s allegations and therefore support a contention that she had made a prior false accusation. The problem with this contention is that defendant never offered such evidence below and repeatedly disclaimed any intent to present evidence regarding the truth of L.'s Nebraska allegation. In his opening brief, defendant states that his trial counsel told the court that "Murillo had denied the allegation and that the defense was willing to subpoena him from out of state if necessary." Defendant supports this statement with citations to two pages of the reporter's transcript. These citations provide no support for the statement. On one of the two cited pages, defendant's trial counsel was responding to the prosecutor's opposition to his Evidence Code section 782 motion by asserting that L.'s allegations *against defendant* were uncorroborated. On the other cited page, defendant's trial counsel was maintaining his willingness to subpoena *Miguel Suarez* from out of state to testify about an alleged instance of sexual acting out behavior by L. Neither citation demonstrates that defendant's trial counsel offered to present testimony by Murillo that he had not molested L.

Our own careful examination of the record discloses no indication that defendant's trial counsel ever actually proffered Murillo's testimony. More importantly, the record discloses no ruling by the trial court excluding Murillo's testimony. Defendant's trial counsel merely stated on information and belief in his declaration in support of his Evidence Code section 782 motion that Murillo had denied the allegation. Defendant's trial counsel later asserted during an argument to the court that Murillo had been willing to go to court to disclaim his confession. The context of the latter remark made it clear that Murillo had been willing to "go to court" *in Nebraska* if the charges against him had not been dismissed, *not* that Murillo had offered to testify in the proceedings in California against defendant. The fact that this remark was accompanied by defendant's trial counsel's repeated statements that he did *not* wish to "try" or "retry" the Nebraska allegations was a further indication that this statement by defendant's trial counsel was not a proffer of Murillo's testimony. Furthermore, there is nothing in the record to suggest that the trial court treated this statement as proffer of such testimony or that the court at any point made a ruling excluding Murillo's testimony particularly in light of the trial court's explicit statement, when it denied the

Evidence Code section 782 motion, that "[o]bviously, a false allegation of abuse would be relevant on the issue of credibility."

As the record does not disclose that defendant's trial counsel ever sought to introduce Murillo's testimony or that the trial court excluded it, defendant's contention lacks merit. (Evid. Code, § 354.)

### 2. *Testimony of Defense Expert*

Defendant claims that the trial court denied him due process by refusing to admit the proffered testimony of defense expert psychiatrist Dr. Joseph Greene on the subject of L.'s credibility.

#### a. *Background*

Defendant's trial counsel's pretrial witness list included Dr. Joseph Greene, but provided no explanation as to the subject matter of Greene's proposed testimony. The prosecution made an in limine motion to exclude Greene's testimony on the ground that the defense had provided no discovery regarding Greene. At the hearing on the in limine motions on February 9, the prosecutor noted that she "still" had "no offer of proof on one Doctor Joseph Green[e], and I need discovery." Defendant's trial counsel agreed to provide the prosecutor with a copy of his "notes of a discussion I had with Doctor Green[e]. He has not written any reports." The prosecutor made a written motion seeking an in limine ruling on the admissibility of evidence of L.'s "psychological disorder" of PTSD as "corroboration" of the molest. The trial court did not make an in limine ruling on this issue.

On February 10, the prosecution called Dr. Ronald Blustein to testify "out of order." Blustein testified on direct that he had seen L. a single time on December 1, 1999, for about an hour. At that time, he found her "clinically depressed," and she reported "suicidal thoughts." The "principal" stress that L. was experiencing was "her coming to court to testify." The history Blustein was given regarding L. was that she had previously been diagnosed as suffering from PTSD secondary to sexual abuse and dysthymic disorder, "a chronic lower grade depression." He did not independently verify this history nor did he diagnose L. with PTSD. Blustein ordered L. hospitalized in December 1999 because he believed that there was a significant risk that she would harm herself.

On February 14, the court and counsel discussed defendant's trial counsel's request for L.'s psychiatric records after December 16, 1999. The prosecutor asserted that these records were not discoverable because they

would only have been pertinent to a motion for L. to testify by closed circuit television, and the prosecution had not proceeded on such a motion. The prosecutor asserted that Blustein's testimony had been taken "out of order" because he was going to be unavailable thereafter and his testimony needed to be preserved "on the narrow issue of the child's fears and her depression stemming from this molest." Defendant's trial counsel argued that the prosecutor had placed L.'s mental condition in issue by presenting Blustein's testimony. He contended that L.'s mental condition was relevant impeachment evidence regarding (1) L's competency to testify, (2) "whether she's delusional" and (3) L's reliability. The trial court, while noting that it did not "quite understand the relevance" of Blustein's testimony, ruled that "the door has been opened" and defendant's trial counsel could review L.'s psychiatric records.

When L. testified at trial, she had noticeable difficulties. The court noted that there were longer and longer pauses between her answers as her testimony wore on. She often testified that she could not remember.

In the course of defendant's trial counsel's cross-examination of L.'s mother, he attempted to inquire about whether L. had been a discipline problem at school. Relevance objections were sustained to these questions, and defendant's trial counsel asked to make an offer of proof. His offer of proof was that the symptoms that had been identified as arising from PTSD actually were not caused by PTSD but by something else that predated the alleged molestations and was "directly related" to L.'s "reliability to recall events." He asserted that he would present testimony from "a doctor" that L. was not suffering from PTSD but instead responding to various "stressors" in her home environment. The trial court reiterated that it had found Blustein's testimony "of marginal relevance," and it would "sustain a 352 objection to delving into every possible reason for either the post traumatic stress disorder diagnosis or the depression diagnosis that was made." Defendant's trial counsel moved on to other inquiries.

The prosecution subsequently moved to strike Blustein's testimony on the ground that it was irrelevant because it would only have been relevant to a motion for L. to testify by closed circuit television. In its motion to strike, the prosecution disavowed any intent to present testimony about PTSD.

On February 17, during defendant's trial counsel's cross-examination of M., he inquired whether L. had recently spoken to M. of suicide. The prosecutor's objections on relevance grounds were overruled. The court noted that the prosecutor had a motion pending to strike Blustein's testimony, but that L.'s state of mind had been addressed at trial and could be

relevant to her credibility. A little later, defendant's trial counsel noted that he had "a good number of other questions having to with [L.'s] mental state." He asked the court if it was the court's position that L.'s mental state as it bore on her credibility "is an area that I cannot go into?" The court stated that "the victim's state of mind is certainly relevant as to her credibility at the time she disclosed or made a report of molestation, at and about that time. . . . and I would include the time leading up to the report. . . . I don't feel that her state of mind in December, six months later, has relevance. So I will limit your questioning to the month of April." Defendant's trial counsel argued that evidence of L.'s state of mind at other times was relevant because "the entire disease or abnormality can not be diagnosed" in the absence of such evidence, and such evidence was relevant to L.'s credibility regarding the event in April. The prosecution again disclaimed any intent to present evidence that L. suffered from PTSD and argued that Blustein had not presented such evidence but simply referred to someone else's past diagnosis.

Defendant's trial counsel argued that he could present evidence that L.'s "acting out behavior" could not have resulted from the alleged April molestations but instead had to have arisen from some earlier "much longer term type of abuse or stimuli." He argued that such prior abuse would make L.'s "reliability . . . highly questionable in that that person would not be able to differentiate between incidents." He asserted that evidence of her post-April state of mind would show that "whatever occurred and is causing this, occurred long before anything [defendant] is alleged to have done." The court asked for an offer of proof regarding some pre-April event "that is causing this behavior to occur." Defendant's trial counsel's only response was that "we have incidents of some fairly severe abhorrent behavior, which indicates this was something likely going on long before [defendant] allegedly did anything, such that it would put in great question whether or not the report of this incident was a correct report or not." The court found no basis to disturb its ruling. "The ruling stands. It strikes me as speculative, at best." Defendant's trial counsel made no attempt to make a further offer of proof.

On February 22, the court considered the prosecution's motion to strike Blustein's testimony. The prosecutor argued that Blustein's testimony "was only relevant" if the prosecution had decided to proceed on its motion for L. to testify by closed circuit television. Since that had not been necessary, Blustein's testimony should be stricken because it was "not relevant to any material issue on the case." Defendant's trial counsel argued that L.'s mental state was in issue and therefore Blustein's relevant testimony on that issue should not be stricken. He argued that L.'s reasons for initially being unwilling to testify in court were relevant to her credibility. He specifically

maintained that Blustein's testimony "will become even more relevant when we call to the witness stand Doctor Green[e] to testify about her mental condition in his opinion." He noted that Greene still had not provided him with a report. This argument led to a discussion of Greene's potential testimony.

Defendant's trial counsel asserted that Greene would testify that L.'s "sexual acting out behavior . . . is of such magnitude that it must, in his expertise, [be] related to a long series of events that must, by reason of the records [of this behavior], precede the April 1999 incident here. How long it precedes, I don't think he's prepared to testify to . . . ." He claimed that Greene would relate this "to his feeling of her reliability as a witness." Greene would testify that "the records show it is not [PTSD] but a much longer term series of stressors of a sexual nature that have caused the present condition."

The court repeated that it found Blustein's testimony about L.'s depression in December 1999 to be "of minimal, if any, relevance" and it discounted his mention of PTSD as merely repeating someone else's diagnosis. "A lot of Doctor Blustein's opinions about [PTSD] were elicited, but I really don't find them to have any weight in this individual case, because he didn't examine L[.] earlier . . . . There were some remarks or some answers that Doctor Blustein gave in his cross-examination that may have some relevance as to L[.]'s credibility, and that's the bottom line here. It seems to be overlooked that the issue isn't her state of mind. In my view, the issue is her credibility now when she's testified, as well as back when she made the original report of the molest." The court refused to strike Blustein's testimony.

Defendant's trial counsel's February 22 motion to admit evidence of L.'s sexual acting out behavior under Evidence Code sections 780 and 782 asserted on information and belief that Greene would testify that (1) this degree of sexual acting out behavior could not have been caused by defendant's molestation of L., (2) this sexual acting out behavior must have been caused by "trauma of a sexual nature occurring over a long period of time," (3) such long term trauma "would destroy [L.'s] ability to distinguish between her sexual wishes and fears and her ability to accurately assess sexual issues" and (4) long term sexual trauma causing such sexual acting out behavior makes a child "an unreliable reporter of sexual events because they tend to confuse the past with the present and fact with fantasy."

Late in the afternoon on February 22, defendant's trial counsel finally provided the prosecutor with a report from Greene. This report stated that

Greene would not only give the testimony set forth in defendant's trial counsel's declaration in support of the motion to admit evidence of sexual acting out behavior but would also testify that (1) L. did not suffer from PTSD, (2) L.'s testimony at trial was confusing and contradictory, (3) L.'s failure to discuss the alleged molestations with more people was inconsistent with the truth of her allegations and (4) although L. may have convinced herself that the molestations occurred, she was not a reliable witness.

The prosecutor objected to Greene's proposed testimony. She claimed Greene's proposed testimony should be excluded because (1) it was not the proper subject of expert testimony, (2) it could not be used to impeach L.'s testimony and (3) it had such little probative value that its relevance was substantially outweighed by the prejudice and time consumption it would involve and therefore it should be excluded under Evidence Code section 352. She also made a *Kelly-Frye* objection (*People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013) to Greene's proposed testimony and claimed that his proposed testimony was just "a back door way of getting information in [*sic*] that is forbidden under 782."

Defendant's trial counsel premised the admissibility of Greene's testimony on Evidence Code section 782. The trial court noted the seeming inconsistency between defendant's assertion that the Nebraska accusation was false and his assertion that Greene would testify that L.'s behavior arose from L. being molested by someone for a long period of time. The court inquired further about the nature of the proposed testimony: "Based on what he reviewed he would have an opinion, I take it and his opinion would be that the testimony of L[.] is unreliable?" Defendant's trial counsel stated that Greene would testify that he had reviewed the records and a person with L.'s symptoms "has got some very serious emotional problems which may distort their ability to, one, perceive an event . . . and/or, two, to be able to testify accurately today." Defendant's trial counsel argued that Greene's testimony would be "very relevant for the Court to determine whether a person with the various psychological makeups and conditions that this witness has is believable in this situation. . . . We're trying to present evidence to the Court which is relevant and meaningful which will help the Court make a determination in this case as to whether or not you believe beyond a reasonable doubt that an offense has occurred." He repeatedly emphasized that Greene would testify only about hypotheticals based on L.'s records rather than about L. specifically.

The court first ruled on defendant's motion under Evidence Code section 782 to admit evidence of L.'s alleged sexual acting out behavior. Because

the defense claimed that the Nebraska allegation was a false accusation, the court noted that evidence regarding the Nebraska allegation would not be admissible under Evidence Code section 782. The court found that the proffered evidence of sexual acting out behavior was not relevant to any of the factors under Evidence Code section 780 and therefore was not admissible under Evidence Code section 782. The court also ruled that none of this evidence bore on L.'s credibility.

The court then considered whether to admit Greene's proposed testimony, and it decided to exclude Greene's testimony under Evidence Code section 352. "In my view, the question is simply whether or not, under 352 analysis, his testimony would be so probative as to outweigh any undue consumption of time, and in attempting to evaluate the probative value of his testimony, it appears to me, based on the offer of proof provided by Mr. Siegel [defendant's trial counsel], that Doctor Green[e] would be speculating about a long term molestation. Mr. Siegel has indicated to the Court, I believe in my questions to him yesterday, that he would, in fact, seek to prove that the Nebraska molestation of L[.] by her uncle did not occur and, of course, is seeking to prove that the molestation of L[.] by her father didn't occur. So Doctor Green[e], as I understand his testimony, would offer an opinion that, in fact, L[.] was the victim of molestation by someone else over a long period of time, and the Court has not heard any evidence that would identify any other possible accused molester; nor is there any such evidence suggested in the offer of proof. It seems to me that Doctor Green[e] would be speculating based on his review of the records of L[.] in this case. [¶] This Court has had the opportunity, of course, to observe her testimony closely, and it seems to me that this Court has the ability to form its own conclusions based on the observations of her testimony along with the other evidence. I cannot find that the probative value of Doctor Green[e]'s proffered testimony is strong. It appears to me to be weak. In this setting, court trials as opposed to a jury trial, I don't think there's a danger necessarily of confusing issues. I don't think it could be said that the state as a party would be prejudiced by this testimony, but I am concerned about the undue consumption of time it would take for Doctor Green[e] to testify and then for the [P]eople to rebut or attempt to rebut his testimony. It would require the calling of other numerous witnesses in rebuttal. So based on this weighing of the factors under 352, the Court is going to exclude the testimony of Doctor Green[e]." The court offered to strike Blustein's testimony if defendant's trial counsel so wished, but defendant's trial counsel declined the offer.

### b. *Analysis*

Trial courts have the discretion to exclude evidence pursuant to Evidence Code section 352 "if its probative value is substantially outweighed by the

probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; *People v. Bittaker* (1989) 48 Cal.3d 1046, 1097 [259 Cal.Rptr. 630, 774 P.2d 659]; *People v. Bothuel* (1988) 205 Cal.App.3d 581, 594-595 [252 Cal.Rptr. 596].) ▮ A ruling excluding evidence under Evidence Code section 352 will be overturned on appeal only if the trial court "exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124 [36 Cal.Rptr.2d 235, 885 P.2d 1].) ▮ The question before us is whether the trial court abused its discretion in determining that the "weak" probative value of Greene's proposed testimony was substantially outweighed by the "undue consumption of time it would take for Doctor Green[e] to testify and then for the People to rebut or attempt to rebut his testimony."

Defendant premises his appellate argument on *People v. Russel* (1968) 69 Cal.2d 187 [70 Cal.Rptr. 210, 443 P.2d 794]. Prior to *Russel*, the California Supreme Court had ruled, in the absence of any legislative authority, that a trial court had the discretion to order a psychiatric examination of the complaining witness in a sex offense case if the defendant presented a "compelling reason" establishing the necessity of such an examination. (*Ballard v. Superior Court* (1966) 64 Cal.2d 159, 176 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416].) Such necessity could only be shown if the allegations had "little or no corroboration" and the defense asserted that there was a connection between the complaining witness's "mental or emotional condition" and her veracity. (*Ballard*, at p. 177.) *Ballard* recognized that expert psychiatric testimony regarding the mental or emotional condition of a witness was generally inadmissible for impeachment purposes, but it recognized an exception to this rule based on a general distrust of complaining witnesses in sex offense cases. (*Ballard*, at pp. 171-175.)

In *Russel*, a judge ordered a psychiatric examination of a complaining witness in a sex offense case, but the trial judge refused, without adequate explanation, to allow the admission of testimony by the psychiatrist who had performed the exam. The California Supreme Court reversed. It concluded that the trial judge had abused his discretion in categorically excluding such evidence. "[I]t must be determined from the offer of proof and, if necessary, from *voir dire* examination, if the evidence sought to be introduced bears upon the matter at issue, to wit, the *credibility* of the complaining witness—by showing the effect of a particular mental or emotional condition upon her ability to tell the truth. In addition, the evidence offered must be examined with a view to ensuring that the knowledge which it represents can be effectively communicated to the jury . . . . Further, the court should

make a determination as to whether the examination which is the basis of the evidence utilized techniques of general scientific acceptance and was sufficiently thorough to facilitate a reliable opinion. Finally, the evidence should be examined with a view to preserving the integrity of the jury as the finder of facts: expert opinion is admitted in this area in order to inform the jury of the effect of a certain medical condition upon the ability of the witness to tell the truth—not in order to decide for the jury whether the witness was or was not telling the truth on a particular occasion. . . . [¶] It is to be emphasized, however, that the considerations above suggested can be undertaken only in the course of a thorough review of the evidence sought to be introduced as it is set forth in the offer of proof. Further, we are of the view that the reasoning underlying the court's conclusion as to the admission of such evidence should appear to some degree in the record in order that appellate review of that conclusion, which reaches only to abuses of the court's discretion . . . , may be facilitated." (*People v. Russel, supra,* 69 Cal.2d at pp. 196-197, citations and fn. omitted.) The *Russel* court opined that "the legal discretion of the judge should be exercised liberally in favor of the defendant." (*Russel,* at p. 198.)

The distrust of complaining witnesses in sex offense cases that formed the foundation for *Ballard* and *Russel* was based on antiquated beliefs that have since been disproved and discarded. Both the Legislature and the California Supreme Court have modernized the law's treatment of sex offense victims. A trial court's discretion to order a psychiatric examination of a complaining witness in a sex offense case was eliminated by the Legislature in 1980. (*People v. Castro* (1994) 30 Cal.App.4th 390, 397 [35 Cal.Rptr.2d 839].) Subsequently, in *People v. Barnes* (1986) 42 Cal.3d 284 [228 Cal.Rptr. 228, 721 P.2d 110], the California Supreme Court declared that "[t]he [1980] amendment of section 261, subdivision (2) [deleting the resistance requirement], acknowledges that previous expectational disparities, which singled out the credibility of rape complainants as suspect, have no place in a modern system of jurisprudence." (*Barnes,* at p. 302.) More recently, the California Supreme Court has recognized that the 1980 legislative prohibition on psychiatric examinations of complaining witnesses in sex crime cases "overruled" the "line of authority" established by *Ballard* and *Russel.* "As defendant notes, earlier cases indicated a trial court should grant a defense motion for a psychiatric examination of the complaining witness in a sex-crime case where psychiatric evidence appeared necessary to assist the trier of fact in assessing the witness's *credibility.* (E.g., *People v. Russel*[*, supra,*] 69 Cal.2d 187, 193 . . . ; *Ballard v. Superior Court*[*, supra,*] 64 Cal.2d 159, 171-177 . . . (*Ballard*) [noting, however, the general rule against impeachment by psychiatric evidence]; *People v. Duncan* (1981) 115 Cal.App.3d 418, 426-427 [171 Cal.Rptr. 406] [finding no abuse of discretion

in denial of defense motion].) But the Legislature overruled this line of authority in 1980 by adopting Penal Code section 1112, which forbids courts from ordering psychiatric examinations of victims or complaining witnesses in sex-crime cases in order to assess their credibility." (*People v. Anderson* (2001) 25 Cal.4th 543, 575 [106 Cal.Rptr.2d 575, 22 P.3d 347].)

Defendant argues in essence that the portion of *Russel* authorizing the admission of expert psychiatric evidence regarding the credibility of a sex crime victim survived the 1980 legislative change. We cannot agree. As the California Supreme Court recognized in *Anderson*, the Legislature's 1980 actions overruled not only *Ballard* but also *Russel*. In the absence of *Russel*, there is no authority for distinguishing between complaining witnesses in sex offense cases and witnesses in other criminal cases.

Defendant proposed to introduce testimony by a psychiatrist who had never examined L. that L. did not suffer from any mental illness diagnosed by any of the psychiatrists who had actually examined her but from some other unspecified emotional problem that had been caused by unspecified long-term sexual abuse. The defense offered no evidence that L. had been subjected to long-term sexual abuse, but instead asserted that she had not been abused either by defendant or by her uncle in Nebraska. The trial court's conclusion that the proffered evidence was speculative and therefore had little probative value is supported by the record. In light of the fact that the proffered evidence was generally inadmissible, highly disfavored and of little probative value, the trial court did not abuse its discretion in concluding that the substantial amount of time that introduction of this evidence would entail was unjustified. Nor did the trial court prevent defendant from presenting a defense and thereby deny him due process. "As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' " (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103 [31 Cal.Rptr.2d 321, 875 P.2d 36].) Greene's proffered testimony was excluded under the "ordinary rules of evidence" and thus did not deny defendant his right to present a defense.

### 3. *Testimony of L.'s Foster Mother*

#### a. *Background*

A defense investigator interviewed L's foster mother (whom we will refer to as FM) in February 2000. FM was L.'s foster mother from June through at

least December 1999.[6] FM told the defense investigator that she "was not able to trust" L. because L. "was not honest" and "told a lot of lies."[7] In his trial brief, defendant's trial counsel indicated that he intended to present the testimony of FM that L. "continually lied and told half truths, untruths and omitted to provide information necessary to effective care of herself by her foster mother." During in limine discussions, the prosecutor noted that it would object to the admission of any testimony by FM on the ground that FM "had agreed to confidentiality about all aspects of the childrens' lives and her care for the children." Defendant's trial counsel asserted that FM would simply be testifying to "her perceptions through various things she's seen."

The department of social services (hereafter the Department) filed a brief objecting to the potential testimony of FM. The Department argued that such testimony could not be received unless there was compliance with Welfare and Institutions Code section 827. The Department acknowledged that there was no authority for the proposition that Welfare and Institutions Code section 827 applied to the proposed testimony of the foster mother, but it asserted that "the same policy considerations" would support applying the statute to the proposed testimony.

The trial court addressed this issue in the midst of trial. The Department argued that "information in the hands of the foster parent or provided by the foster parent would be protected by 827, which means that the foster parent could not release that information in the form of testimony unless the juvenile court judge says, after an in camera hearing, that it rules that the relevance and pertinence of the information would supersede the child's right to privacy." Defendant's trial counsel argued that the child's privacy rights had been waived by her complaint and testimony. He also contended that no records were at issue since FM would not be disclosing records but testifying to her perceptions. The trial judge decided to refer the issue to the juvenile court to determine whether FM's proposed testimony was admissible.

The juvenile court heard this matter on February 23. The juvenile court judge ruled that FM's proposed testimony was not admissible. The trial court was informed of this ruling, and defendant's trial counsel did not further pursue the matter.

---

[6]It is not clear from the record exactly how long FM served as L.'s foster mother. It appears that FM was due to be relieved of this responsibility less than a week after the juvenile court hearing on the admissibility of her testimony.

[7]FM also characterized L. as "coquettish" with males and as dressing "provocatively" during a period before L. acquired a steady boyfriend. However, defendant does not assert on appeal that the court erred in excluding testimony to this effect.

b. *Analysis*

 Defendant maintains that the trial court prejudicially erred in excluding FM's proposed testimony. The only basis offered below for exclusion of FM's proposed testimony was the juvenile court's ruling under Welfare and Institutions Code section 827 (hereafter section 827). The initial question we must resolve is whether section 827 was even applicable to FM's proposed testimony. We conclude that it was not.

Section 827 restricts those who may "inspect" a "juvenile case file." It provides that, "[f]or purposes of this section, a 'juvenile case file' means a petition filed in any juvenile court proceeding, reports of the probation officer, and all other documents filed in that case or made available to the probation officer in making his or her report, or to the judge, referee, or other hearing officer, and thereafter retained by the probation officer, judge, referee, or other hearing officer." (§ 827, subd. (e).)

Subdivision (a)(1) of section 827 sets forth a list of those who are permitted to inspect juvenile case files, but subdivision (a)(3) requires those authorized in subdivision (a)(1) to petition the juvenile court for access to all or a portion of a juvenile *dependency* case file or to "information relating to the contents of" a juvenile *dependency* case file. Those authorized in subdivision (a)(1) include "[c]ourt personnel," "[t]he attorneys for the parties, and judges, referees, other hearing officers, probation officers and law enforcement officers who are actively participating in criminal or juvenile proceedings involving the minor," the minor's parents and "[a]ny other person who may be designated by court order of the judge of the juvenile court upon filing a petition." (§ 827, subd. (a)(1)(A), (D), (E), (M).) Consequently, *if* the presentation of FM's proposed testimony amounted to inspection of a "juvenile [dependency] case file" or "information relating to the contents" of a juvenile dependency case file, then the proposed testimony could not be presented without a juvenile court order authorizing its disclosure. The juvenile court may order disclosure of a file or information relating to the contents of a file after a noticed hearing "if disclosure is not detrimental to the safety, protection, or physical or emotional well-being of a child." (§ 827, subd. (a)(3).)

FM's proposed testimony was *not* a juvenile court petition, probation report or any other document and therefore was not a "juvenile case file" as that term is defined in section 827. Nor was FM's proposed testimony "information relating to the contents of" a juvenile case file. FM's proposed testimony was based on FM's personal observations acquired from her one-on-one interaction with L. while she served as L.'s foster parent. There

was no indication that FM had had any access to L.'s juvenile dependency case file or that her testimony would be based on any information related to that file. Based solely on the statutory language, which is unambiguous, FM's proposed testimony would not have amounted to the disclosure of a "juvenile [dependency] case file" or of "information related to the contents of" a juvenile dependency case file and therefore did not come within section 827, subdivision (a)(3)'s requirement of a court order authorizing disclosure of such a file or information.

The Department has filed an amicus curiae brief in which it asserts that section 827 did apply to FM's proposed testimony. It argues that the "information" a foster parent "obtains" concerning a foster child "should have the same confidentiality protections" as the documents in a juvenile dependency case file and information relating to those documents. The Department acknowledges that no case has yet held that section 827 applies to a foster parent's testimony about his or her interactions with a foster child. Yet the Department argues that cases holding that child protective services (CPS) records and police records are within the ambit of section 827 support extending section 827 to foster parent observations. We disagree.

The Department relies on three cases. None of them support the Department's argument. In *Lorenza P. v. Superior Court* (1988) 197 Cal.App.3d 607 [242 Cal.Rptr. 877], a criminal defendant charged with the murder of her daughter subpoenaed CPS documentary "records" relating to herself, her daughter and her son. At the commencement of its discussion of the appropriate procedures under section 827, the Court of Appeal noted that section 827 applied to "agency records relating to juvenile contacts as well as police reports." (*Lorenza P.*, at p. 610.) The court did not discuss any issues regarding the scope of section 827, nor did it suggest that section 827 applied to anything other than CPS records and police reports regarding juveniles. In *T.N.G. v. Superior Court* (1971) 4 Cal.3d 767 [94 Cal.Rptr. 813, 484 P.2d 981], the California Supreme Court held that police and probation department records of detentions of juveniles were juvenile court records within the meaning of section 827 that could not be revealed to "third parties" without a juvenile court order. (*T.N.G.*, at p. 780.) In *Wescott v. County of Yuba* (1980) 104 Cal.App.3d 103 [163 Cal.Rptr. 385], the court, relying on *T.N.G.*, held that a police report regarding several juveniles who were not detained was subject to section 827 and therefore could not be released in its totality to the parent of one of the juveniles without a juvenile court order. (*Wescott*, at pp. 105-110.)

None of these cases provide the slightest support for the Department's position. The mere fact that police records of juvenile detentions and juvenile contacts are considered juvenile court records for purposes of section

827 does not establish or even suggest that the percipient observations of a foster mother are part of a "juvenile case file" or "information related to" such a file within the meaning of section 827. The Department's desire to expand the scope of section 827 should be addressed to the Legislature since we lack the power to rewrite section 827 to include foster parent observations within its scope. It follows that the trial court erred in referring the issue of the admissibility of the proposed testimony to the juvenile court, and the juvenile court erred in ruling that the proposed testimony could not be disclosed.

The Attorney General appears to argue that any error under section 827 is immaterial because the trial court "could have (and most probably would have)" excluded FM's proposed testimony under Evidence Code section 352 if it had not referred the issue to the juvenile court. He cites no case authority for the proposition that a trial court's erroneous *nondiscretionary* exclusion of evidence may be justified by appellate speculation about whether the court could have, or "probably would have," made a *discretionary* decision to exclude the evidence if a different objection to its admission had been interposed. In any event, the record before us provides no basis for us to infer that the trial court "most probably would have" excluded this evidence had the prosecution interposed an Evidence Code section 352 objection.

Both the Department and the Attorney General concede that this evidence was relevant otherwise admissible evidence if section 827 did not bar its admission. Had an Evidence Code section 352 objection been interposed, the trial court would have been required to admit the evidence unless the probative value of the evidence was "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) The Attorney General does not intimate how the admission of this evidence would have unduly consumed time or created a danger of undue prejudice or confusion of the issues. Since there was no jury, we may presume that the Attorney General is not relying on the potential for the trial court to be somehow misled by the admission of evidence regarding the credibility of the complaining witness. As L.'s credibility was central to this case, it also does not appear that the admission of this fairly straightforward testimony would have consumed an *undue* amount of time or confused the issues. While the relationship between L. and FM might have been prejudiced by FM's testimony if L. learned of this testimony, the potential for such prejudice did not necessarily substantially outweigh the probative value of evidence of L.'s lack of credibility particularly in light of indications that FM's foster parent relationship with L. either

was over or was soon to end and did not appear to be a relationship of trust. We cannot justify the trial court's nondiscretionary exclusion of FM's proposed testimony by assuming that it would have made a discretionary decision to exclude it under Evidence Code section 352 where the record before us does not contain a strong basis for excluding this testimony under Evidence Code section 352.

What remains is for us to determine whether the erroneous exclusion of FM's proposed testimony merits reversal of the trial court's judgment. Defendant and the Attorney General do not agree on the appropriate standard of review that we should apply to this error. Defendant argues that the exclusion of this evidence requires reversal unless its absence was harmless beyond a reasonable doubt because its exclusion violated his federal constitutional right to due process by depriving him of the opportunity to "present critical evidence in his defense." He asserts that the prejudice arising from the exclusion of FM's proposed testimony regarding L.'s credibility was substantial because "this case rested almost entirely on the relative credibility" of L. and defendant. The Attorney General, on the other hand, maintains that the error is properly reviewed under *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243] and requires reversal only if it is reasonably probable that the court would have believed defendant rather than L. if only this evidence had been admitted. The Attorney General urges that the excluded evidence was unlikely to influence the trial court's decision and therefore its erroneous exclusion does not merit reversal.

· **(5)** Where a "trial court's ruling did not constitute a refusal to allow defendant to present a defense, but merely rejected certain evidence concerning the defense," the ruling does not constitute a violation of due process and the appropriate standard of review is whether it is reasonably probable that the admission of the evidence would have resulted in a verdict more favorable to defendant. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325 [65 Cal.Rptr.2d 145, 939 P.2d 259]; *People v. Watson, supra,* 46 Cal.2d at p. 836.) Although the trial court's error did result in the exclusion of evidence that L. repeatedly lied to her foster mother about her homework, fighting at school and being placed on detention at school, we are not convinced that this evidence was "critical" to defendant's defense or that its exclusion amounted to the exclusion of a defense rather than evidence concerning a defense. The evidence adduced by the defense at trial included other similar evidence aimed at attacking L.'s credibility. L.'s sister J. testified that she did not initially believe L. about the Nebraska molestation because L. "made up a lot of stories." Defendant's sister, who, like FM, had served as a caretaker for L., testified that she was concerned that L. might falsely accuse her son or husband of sexual molestation. Defendant testified that he believed L. was dishonest because he had been told by L.'s mother that L. was

rebellious and did not like school and her sisters had told him that L. talked back and caused problems.

 In the context of this other evidence, FM's proposed testimony that L. had lied to FM about homework and misbehavior at school was not critical and its erroneous exclusion did not preclude defendant from presenting his defense based on L.'s lack of credibility. Therefore, we are persuaded that the appropriate standard of review is *Watson*.

This was a court trial in which the court was well aware of FM's proposed testimony even though it excluded this evidence. The court also made explicit findings regarding L.'s credibility that unambiguously credited her testimony and rejected all of defendant's attempts to demonstrate that L. was not telling the truth about his molestation of her. The trial court also explicitly rejected defendant's testimony as not credible. Defendant's conduct on April 26 provided significant corroboration for L.'s allegations. Defendant's sister confirmed L.'s report that the bedding had been removed from her bed and laundered after the final molestation. At trial, defendant attempted to explain his actions on April 26 by giving several different stories about how he had learned that L. had accused him of molesting her, but his various explanations were facially inconsistent and ultimately inculpatory.

The trial court rejected defendant's other attempts at attacking L.'s credibility, was aware of the excluded evidence and found defendant's testimony not credible and L.'s very credible. Defendant's sister's testimony about the bedding and defendant's inconsistent explanations for his apparent assumption that L. had accused him of molesting her provided corroboration for L.'s allegations. Defendant presented no evidence of any rational motivation for L. to fabricate her allegations. FM's proposed testimony would only have shown that L. lied under circumstances where her motivation for doing so was obvious. In this context, it is not reasonably probable that the admission of FM's proposed testimony would have resulted in a verdict more favorable to defendant. Hence, the error in excluding FM's proposed testimony does not merit reversal of the judgment.

### B. *Insufficient Evidence of Duress*

The elements of a Penal Code section 288, subdivision (b) violation differ from the elements of a Penal Code section 288, subdivision (a) violation in only one respect. A Penal Code section 288, subdivision *(b)* violation occurs only where the lewd act is accomplished "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or

another person . . . ." (Pen. Code, § 288, subd. (b).) Similarly, an element of forcible rape is that the act of sexual intercourse was accomplished "by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (Pen. Code, § 261, subd. (a)(2).) ■ An element of an attempt to commit forcible rape is that the perpetrator specifically intended to accomplish intercourse with the victim by such means. (Cf. *People v. Miller* (1935) 2 Cal.2d 527, 530 [42 P.2d 308, 98 A.L.R. 913].)

■ There was no evidence presented at trial that defendant used or intended to use force, violence, menace or fear of immediate bodily injury in his commission of any of his offenses against L., and the prosecutor expressly premised both the Penal Code section 288, subdivision (b) count and the attempted rape count solely on "duress." She based this argument on *People v. Schulz* (1992) 2 Cal.App.4th 999 [3 Cal.Rptr.2d 799]. The prosecutor claimed that "the evidence would support a finding of duress with respect to all five instances of molest," but only two of the counts required such a finding. She pointed out that (1) defendant was older than L., (2) defendant was much larger than L., (3) L. had not lived with defendant for many years, (4) he was her natural father and (5) she was scared of him. The prosecutor argued that L. had been "paralyzed" by her fear of defendant. She maintained that defendant physically and psychologically dominated L. thereby committing the acts by duress. The court explicitly relied on *Schulz* and found that defendant had committed these two counts by duress. It found that duress was supported by L.'s dependence on defendant, the size and age disparities, her limited intellectual level and her fear of defendant.

We begin with *Schulz* since it was the basis for the trial court's decision and is a decision of this court. In *Schulz,* the defendant lived with his nine-year-old niece. One night, he woke her up "by grabbing her arm, cornered her while she cried, held her arm, and touched her breasts and vaginal area." (*People v. Schulz, supra,* 2 Cal.App.4th at p. 1004.) He had molested her on a number of occasions previously. This court held that defendant had accomplished this lewd act by duress.

"Physical control can create 'duress' without constituting 'force.' 'Duress' would be redundant in the cited statutes if its meaning were no different than 'force,' 'violence,' 'menace,' or 'fear of immediate and unlawful bodily injury.' . . . 'Duress' has been defined as 'a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' . . . [D]uress involves psychological

coercion. Duress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes. . . . 'Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim' [are] relevant to the existence of duress." (*People v. Schulz, supra,* 2 Cal.App.4th at p. 1005, citations omitted.) In *Schulz,* this court assessed the defendant's offense against this standard. "In our view duress was involved in this 'nightmare' incident. The victim, then nine years old, was crying while defendant, her adult uncle, restrained and fondled her. On this occasion he took advantage not only of his psychological dominance as an adult authority figure, but also of his physical dominance to overcome her resistance to molestation. This qualifies as duress." (*Schulz,* at p. 1005.)

We agree with this court's conclusion in *Schulz* that, where the defendant grabbed and restrained the nine-year-old distraught victim, cornered her and used his physical dominance in conjunction with his psychological dominance to overcome her resistance, the lewd act was accomplished by duress. However, the evidence before us is substantially different. Defendant did not grab, restrain or corner L. during the final incident out of which the Penal Code section 288, subdivision (b) count and the attempted rape count arose. L. did not cry, and she offered no resistance. Instead, defendant simply lewdly touched and attempted intercourse with a victim who made no oral or physical response to his acts.[8]

None of the other cases cited by the parties supports a conclusion that these acts were accomplished by duress. In *People v. Superior Court (Kneip)* (1990) 219 Cal.App.3d 235 [268 Cal.Rptr. 1], this court concluded that evidence that the defendant had explicitly threatened the victim with humiliation was sufficient to support a "bindover" of the defendant for trial. (*Kneip,* at p. 239.) In *People v. Senior* (1992) 3 Cal.App.4th 765 [5 Cal.Rptr.2d 14], during the initial molestation the defendant threatened to hit his daughter if she resisted. During later molestations, he restrained her. This court found sufficient evidence of duress as to the later molests in the prior threat and the later restraint. (*Senior,* at pp. 775-776.) In *People v. Sanchez* (1989) 208 Cal.App.3d 721 [256 Cal.Rptr. 446], the defendant physically pulled the victim to require her to perform the acts and threatened that the victim's mother would hit the victim if the victim told about the molestations. The court found that this constituted substantial evidence that the acts were accomplished by duress. (*Sanchez,* at p. 748.)

---

[8] L. testified that she moved when defendant tried to place his penis inside her vagina and thereby prevented him from accomplishing this act. There was no evidence defendant responded to her movement in any way other than to discontinue his conduct. Certainly there was no evidence that he attempted to overcome this possible act of resistance.

In *People v. Hecker* (1990) 219 Cal.App.3d 1238 [268 Cal.Rptr. 884], the defendant had anal and vaginal intercourse with his 13-year-old stepdaughter. She testified that during a previous molestation she had unsuccessfully tried to resist, but she did not resist on this occasion. The sex acts "hurt." (*Hecker*, at p. 1241.) She suffered both vaginal and anal injuries from these acts. The defendant warned her not to reveal the molestations because it would hurt his marriage and his career. (*Hecker*, at p. 1242.) She testified that she felt psychological pressure and was afraid. (*Ibid.*) The *Hecker* court found insufficient evidence of duress. " 'Psychological coercion' without more does not establish duress. At a minimum there must be an implied threat of 'force, violence, danger, hardship or retribution.' " (*Hecker*, at pp. 1250-1251.) "By enacting subdivision (a) of section 288 and providing the serious penalties it imposes, the Legislature has recognized that all sex crimes with children are inherently coercive. . . . We are merely giving recognition to the Legislature's determination in enacting subdivision (b) that defendants who compound their commission of such acts by the use of violence or threats of violence should be singled out for more particularized deterrence." (*Hecker*, at p. 1251.)

The only way that we could say that defendant's lewd act on L. and attempt at intercourse with L. were accomplished by duress is if the mere fact that he was L.'s father and larger than her combined with her fear and limited intellectual level were sufficient to establish that the acts were accomplished by duress. What is missing here is the " 'direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' " (*People v. Wilkerson* (1992) 6 Cal.App.4th 1571, 1578-1579 [8 Cal.Rptr.2d 392].) Duress cannot be established unless there is evidence that "the victim['s] participation was impelled, at least partly, by an implied threat . . . ." (*Id.* at p. 1580.) No evidence was adduced that defendant's lewd act and attempt at intercourse were accompanied by any "direct or implied threat" of any kind. While it was clear that L. was afraid of defendant, no evidence was introduced to show that this fear was based on anything defendant had done other than to continue to molest her. It would be circular reasoning to find that her fear of molestation established that the molestation was accomplished by duress based on an implied threat of molestation.

We find no evidence in the record that defendant utilized any direct or implied threat in accomplishing these acts on L. Consequently, the Penal Code section 288, subdivision (b) conviction must be reduced to reflect a conviction of the lesser included offense of violating Penal Code section

288, subdivision (a). (*People v. Kelly* (1992) 1 Cal.4th 495, 528 [3 Cal.Rptr.2d 677, 822 P.2d 385].) As there are no lesser included offenses of attempted forcible rape that are supported by the evidence here, the attempted rape count must be stricken for insufficiency of the evidence. Because neither of these counts affected defendant's sentence, there is no need for resentencing, and we will simply order the trial court to amend the abstract of judgment to reflect these changes.

## II. *Petition for Writ of Habeas Corpus*

■ Defendant petitions for a writ of habeas corpus based on allegations that he has "newly discovered" evidence that his girlfriend, Lola Lujan, spent the night at his apartment on April 25, 1999. He claims that this evidence "completely undermines" L.'s credibility, and therefore he is entitled to a new trial. In support of his petition, he offers a declaration by Lujan that she was at defendant's apartment beginning in the afternoon on April 25. She declares that she was there when the girls had dinner, and she spent the night in defendant's bedroom with him. Lujan also declares that she recalls defendant taking the girls to school the next morning. Defendant also offers a declaration by Lujan's friend that defendant picked Lujan up at the friend's home on some afternoon in April 1999, and Lujan later told the friend that defendant had been charged with a molestation that had allegedly occurred that evening.

■ "[N]ewly discovered evidence is a basis for [habeas corpus] relief only if it undermines the prosecution's entire case. It is not sufficient that the evidence might have weakened the prosecution case or presented a more difficult question for the judge or jury. . . . '[A] criminal judgment may be collaterally attacked on the basis of "newly discovered" evidence only if the "new" evidence casts fundamental doubt on the accuracy and reliability of the proceedings. At the guilt phase, such evidence, if credited, must undermine the entire prosecution case and point *unerringly to innocence or reduced culpability*.' " (*In re Clark* (1993) 5 Cal.4th 750, 766 [21 Cal.Rptr.2d 509, 855 P.2d 729], citations omitted.) "[E]vidence which is uncertain, questionable or directly in conflict with other testimony does not afford a ground for relief upon habeas corpus." (*In re Lindley* (1947) 29 Cal.2d 709, 722 [177 P.2d 918].) "[N]ewly discovered evidence does not justify relief unless it is of such character as will completely undermine the entire structure of the case upon which the prosecution was based." (*Lindley*, at p. 723.) "In contrast with ineffective assistance claims, '[t]he high standard for newly discovered evidence claims presupposes that all the essential elements of a presumptively accurate and fair proceeding were present in the proceeding whose result is challenged." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1246 [275 Cal.Rptr. 729, 800 P.2d 1159], citations omitted.)

██ An examination of the evidence presented at trial reveals that defendant has failed to make out a prima facie case that meets this "high standard." When L. was interviewed on April 26 by Gleason, L. initially stated that the most recent molestation had occurred "last night" when defendant "tried to put his thing in me." A little later in the interview, L. stated that this most recent event had not happened "this morning" but "yesterday morning." A transcript of this interview was introduced at trial. Just before trial, in defendant's trial counsel's trial brief, he stated that he intended to call Lujan to testify at trial but had lost contact with her and was still looking for her. At trial, L. testified that she could not recall when the final molestation occurred, but she did indicate on both direct examination and cross-examination that it had happened on a school day. On cross-examination, she seemed to testify at one point that no molestations had occurred between the time she first told Veronica about the molestations at noon on Friday, April 23 and the time she reported the molestations to a counselor on the morning of Monday, April 26. However, she also stated that she could not remember when the final molestation occurred or whether the final molestation happened on a weekday or a weekend. L. affirmed that she had remembered the event better when she was interviewed by Gleason on April 26. L. and her sister J. both testified at trial that J. and A. frequently spent the night in defendant's bedroom, and L. testified that the molestations occurred on nights when her sisters were sleeping in defendant's bedroom.

Defendant admitted at trial that the girls slept in his room on two to four occasions during the first week they lived with him, but he claimed that L. was one of those sleeping in his room on some of those occasions and that this activity ended after the first week when he installed a lock on his bedroom door and told the girls to sleep in their own room. Defendant also testified that Lujan had come to his apartment on the evening of Sunday, April 25 "[a]fter the girls were asleep, approximately between 10:00 and 11:00" p.m. and spent the night with him in his bedroom that night. On cross-examination, defendant testified ambiguously that Lujan "was there Saturday night, Sunday night." At the end of the defense case, defendant's trial counsel explained that he wanted to present Lujan's testimony, but he had been unable to find her. The prosecutor stipulated that the defense had made diligent though unsuccessful efforts to find Lujan. Defendant's trial counsel noted that Lujan had been in local custody, but she had been transported elsewhere and could not be found.

Defendant's purported "newly discovered" evidence is not of such a character that it would completely undermine the prosecution's case nor does it unerringly point to innocence. At most, Lujan's testimony would have provided some corroboration for defendant's trial testimony that Lujan

spent the night of April 25 with him in his bedroom. The record before us reflects that Lujan is a drug-addicted incarcerated felon who is obviously biased in defendant's favor yet chose to disappear at the time of trial, and her declaration conflicts with defendant's trial testimony regarding the length of her stay at his apartment on April 25. Under these circumstances, it certainly cannot be said that her testimony that she was at defendant's apartment on the evening of April 25 would have completely undermined the prosecution's case or demonstrated defendant's innocence. Instead, this evidence would merely have weakly corroborated defendant's less than credible testimony on this point, which was in conflict with other evidence.

Defendant has failed to make out a prima facie case in support of his petition and therefore it must be summarily denied.

### Disposition

The judgment is hereby modified in the following particulars. The Penal Code section 288, subdivision (b) conviction shall be modified to reflect a conviction of the lesser included offense of violating Penal Code section 288, subdivision (a) due to the insufficiency of the evidence of duress. The attempted rape conviction is stricken due to the insufficiency of the evidence of duress. The trial court is ordered to prepare an amended abstract of judgment reflecting these modifications and to forward a copy of this abstract to the Department of Corrections. The modified judgment is affirmed. The petition for a writ of habeas corpus is summarily denied.

Premo, Acting P. J., and Elia, J., concurred.

The petitions of both appellant and respondent for review by the Supreme Court were denied May 15, 2002.