Filed 5/26/21  P. v. Sanchez-Cortes CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>JOEL ISMAEL SANCHEZ-CORTES,<br><br>　　Defendant and Appellant. | G058917<br><br>(Super. Ct. No. 18HF0393)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Lance Jensen, Judge.  Affirmed.

The Appellate Law Firm, Corey Evan Parker and Berangere Allen-Blaine for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted appellant Joel Ismael Sanchez-Cortes of forcible sexual penetration (Pen. Code, § 289, subd. (a)(1)(A)); sexual battery by restraint (Pen. Code, § 243.4, subd. (a)); false imprisonment by violence (Pen. Code, §§ 236 and 237, subd. (a)); and misdemeanor assault (Pen. Code, § 240), as a lesser included offense of assault to commit rape (Pen. Code, § 220, subd. (a)(1)). The trial court sentenced appellant to a prison term of seven years and eight months, comprising six years for the sexual penetration, one year consecutive for the sexual battery, and a consecutive eight months for the false imprisonment; the sentence on the misdemeanor assault conviction was suspended.

Appellant contends the trial court prejudicially erred in making three evidentiary rulings during trial: (1) Excluding evidence the victim made a prior false allegation of sexual misconduct; (2) Sustaining a hearsay objection to his attempt to introduce through a police detective witness a statement appellant's sister-in-law said was made by appellant's sister; and (3) Permitting the prosecutor to briefly cross-examine appellant's sister-in-law about her financial interest in cosigning for a bond in support of appellant's release on his then-pending immigration asylum petition.

We reject all three contentions and affirm.

## FACTS[1]

The dramatis personae in this matter are all close family members.[2] Appellant and Jane Doe are siblings who had recently reconnected after 13 years. On the evening of January 13, 2018, appellant and a third sibling, Jose, arrived at Jane Doe's apartment uninvited. She let them in, they got food, and sat around for a while drinking.

---

[1] Appellant's briefs are peppered with citations to facts found in the reporter's transcript of the preliminary hearing in this matter. The evidence at that hearing consisted of the Proposition 115 hearsay testimony of two police officers, none of which was admitted into evidence at trial. (See Pen. Code, § 872, subd. (b).) As such, these "facts" are irrelevant, and we have not considered them.

[2] For purposes of clarity, and to protect their privacy, we refer to the family members other than appellant and Jane Doe by their first names only. We mean no disrespect.

Jane Doe and Jose argued, the brothers left, and Jane Doe went to the bed she shared with her youngest daughter.

At 3:00 a.m., appellant returned and knocked on the front door. Jane Doe let him in, told him to sleep on the couch in the living room, and gave him a blanket. She returned to her bedroom and went back to bed. The next thing she knew, appellant was next to her in her bed and touching her. He pulled off the covers, and touched her feet. He moved his hands up under her pants, and began touching her vagina. He climbed on top of her, started kissing her, pulled down her bra, and began to touch her breasts. She pushed his hands away, but he put his hands back onto her breasts. She told appellant to stop. Instead, he inserted his middle finger inside her vagina and started moving it "harshly" and "briskly." She struggled with appellant, while he was "shush[ing]" her to be quiet so as to not wake her daughter. She was finally able to get appellant off her and told him to leave.

She tried to leave the room, but appellant picked her up with his hands between her legs. She pushed him back, and ran to the bathroom. She tried to close the door, but appellant stuck his foot in to stop the door from closing. He entered, pushed her toward the sink, and started kissing her again. He once more touched her breasts and then unbuckled his belt and unbuttoned his pants. She pushed him off, and he finally let her out of the bathroom.

She went into the kitchen and started to heat some water for coffee. Appellant followed her and pushed her against the wall. He grabbed both of her hands with one hand, put her hands above her head, and touched her breasts with the other hand. She got one hand loose and threatened appellant that she would throw the hot water on him. Appellant let her go, went into the living room, and sat on the couch. She made coffee, texted Jose to come pick up appellant, and checked on her daughters. Meanwhile, appellant fell asleep. Jane Doe woke up her daughters and they left her apartment and went to a friend's home.

Jane Doe admitted she did not call the police, but said she called their sister Elizabeth later that morning and told her what happened. She told Elizabeth appellant tried to rape her. She said she struggled with appellant, he came into her room when she was asleep, he touched her vagina, and tried to put his fingers into her vagina. Elizabeth told Jane Doe not to say anything more.

A few days later, Elizabeth was at brother Jose's home with Jose and appellant. She overheard Jose ask appellant why Jane Doe did not want appellant to go to her apartment. Appellant replied, "Because I'm very bad."

Jane Doe finally called the police on February 21. She explained she did not call sooner because she did not think anything would happen and she just wanted to stay away from her family. However, her son had found out about what happened, and he wanted to kill appellant. She assured her son she would instead handle it by reporting it to the police.

Afterward, working with police, Jane Doe exchanged text messages with appellant, made recorded pretext phone calls, and even met once with appellant while wearing a wire. On each of those occasions, appellant made incriminating admissions.

Appellant testified in his defense. He said that after Jose and he left that night, he returned and knocked on the door. Jane Doe opened the door and let appellant in. They sat on the couch and she brought appellant a beer and got some wine for herself. She offered to rub his back and then touched his penis twice, over his pants. She then said she was going to bed. Appellant lay down on the couch and remembered back to when he was 14 and Jane Doe was 22.[3] He was asleep next to her and she started touching his penis.[4] He said she asked him to come sleep with her, but he declined. He said he never told anyone about this incident.

---

[3] At the time of the incident, Jane Doe was 46 years old, and appellant was 38.

[4] Jane Doe had testified appellant touched her breasts while she was asleep on several occasions when the family all lived together in Mexico years earlier.

4

Appellant said this rekindled memory caused him to go to her bedroom and confront her about the incident from when he was 14. He touched her foot to wake her up. He asked her why she had touched him again, like she had when he was 14. She did not respond, but told her daughter to go sleep in the other room with her other daughter.

When her daughter left, she then grabbed his penis again. He said he touched her breasts and "bottom," but denied "any of the other things I'm being accused of." She pushed him away and walked to the bathroom. He followed her to ask her why she was doing what she was. Appellant denied blocking the bathroom door or that anything she had testified to happened in the bathroom. He said he simply used the bathroom, returned to the kitchen where she had made two cups of coffee, and they sat at the kitchen table and talked.

Regarding the cold calls, appellant said he did not want to talk about the incident on the phone with her because it was shameful and uncomfortable. He also insisted she was just trying to manipulate him during the arranged face-to-face conversation, and he felt obligated to say whatever she wanted him to say because she was "pressuring" him.

Jose testified that in December 2017, about a month before the incident at Jane Doe's apartment, his sister Elizabeth had picked him up at the airport and told him that "something really ugly was going to happen." Elizabeth did not want to tell him the details and said the person who told her said not to say anything.

Brandon, appellant's nephew and son of Daniel, another of appellant and Jane Doe's brothers, testified he was helping his aunt Elizabeth move on January 4, 2018, about a week before the incident at Jane Doe's apartment, and he overheard Elizabeth and his mother Irma talking. Brandon said he heard Elizabeth say, "Something very bad will happen in the family." He did not hear anything further and never asked anyone about it. Brandon was sure of the date because he had his bank statement showing a food

5

purchase he made on the day when he was helping Elizabeth move. He acknowledged he did not tell police about the bank statement when they interviewed him.

Irma, appellant and Jane Doe's sister-in-law and Daniel's wife, testified that when she was helping Elizabeth move on January 4, 2018, Elizabeth said "something very ugly was going to happen in the family." Irma said Elizabeth did not explain what she meant, and could not tell her anything "until the person decides to speak." She asked Elizabeth if the family was going to be affected, and Elizabeth replied that "if the person decided to speak out, then all of us were going to be affected." Irma further said that a few days *before* appellant's arrest, Elizabeth "told me that I wouldn't have to worry about [appellant] anymore."[5]

DISCUSSION

*Standard of Review*

As stated, appellant challenges three evidentiary rulings the court made in the course of the trial. Our review of all three is identical: "[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the relative probativeness and prejudice of the evidence in question" under Evidence Code section 352.[6] (*People v. Waidla* (2000) 22 Cal.4th 690, 724.) This same standard applies to a ruling "that turns on the relevance of the evidence," as well as "one that turns on the hearsay nature of the evidence in question[.]" (*Id.* at pp. 723, 725.)

In assessing prejudice, any error in the admission or exclusion of evidence warrants reversal of a judgment only if an examination of the entire cause discloses the error produced a "miscarriage of justice." (*People v. Breverman* (1998) 19 Cal.4th 142,

---

[5] Elizabeth had earlier testified her conversation with Irma about "something very ugly" happening to the whole family occurred *after* appellant's arrest, not before. She denied talking to Irma at all about the subject during her move. She also denied telling Jose at the airport in December that "something really bad was about to happen" for the family, or that Jane Doe had "sworn [her] to secrecy."

[6] All further statutory references are to the Evidence Code unless otherwise indicated.

6

173.)[7] "'[A] "miscarriage of justice" should be declared only when the court . . . is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*People v. Mullens* (2004) 119 Cal.App.4th 648, 659, citing *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

*Exclusion of a False Accusation of Sexual Misconduct Made by Jane Doe*

Before trial, the prosecutor brought a motion to preclude evidence of Jane Doe's prior sexual history under the rape shield law. (See *People v. Fontana* (2010) 49 Cal.4th 351, 354 ["Under California's rape shield law, specific instances of a complaining witness's sexual conduct are not admissible to prove consent by the complaining witness in a prosecution for specified sex offenses"]; but see § 1103, subd. (c)(3) [inapplicable to sexual conduct with the defendant].) She told the court she believed the defense would attempt to bring up allegations of prior sexual conduct both between appellant and Jane Doe, and between Jane Doe and her brother Daniel. Defense counsel agreed, and said he wanted to introduce such evidence to show Jane Doe was the aggressor in this case and any sexual activity was "consensual versus forced."

The court ruled that evidence of previous sexual conduct between Jane Doe and appellant was relevant as to consent and would be admissible, finding the evidence more probative than prejudicial. (Cf. *People v. Fontana, supra,* 49 Cal.4th at p. 354 ["Such evidence may be admissible, though, when offered to attack the credibility of the complaining witness, provided that its probative value outweighs the danger of undue prejudice and the defendant otherwise complies with the procedures set forth in [section] 782"]; see also § 1103, subd. (c)(5).) The court further ruled the prosecutor could preemptively rebut such evidence in her case-in-chief pursuant to section 1108. Ultimately, both Jane Doe and appellant testified about prior unconsented sexual

---

[7] "No judgment shall be set aside, or new trial granted, in any cause, on the ground of . . . the improper admission or rejection of evidence . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art VI, §13.)

7

touching incidents occurring in Mexico many years earlier, with each blaming the other as the instigator and aggressor.

The discussion then turned to defense counsel's claim of a prior occasion where Jane Doe falsely accused her brother Daniel of sexually assaulting her when, in fact, she had sexually assaulted him. Counsel proffered testimony from Daniel regarding an alleged incident in Mexico 38 years before, when Daniel was 5 or 6 years old and Jane Doe was 10 or 11. He said he would show Jane Doe had done something to Daniel similar to what she had allegedly done to appellant in the current case, and thereby establish Jane Doe was a sexual aggressor and both appellant and Daniel were simply innocent participants.

The prosecutor responded that Jane Doe insisted it was Daniel who had "touched her when she was younger." She pointed out: "[B]ut we have no other information other than two siblings pointing the finger at each other that they each assaulted each other. Daniel is not a party to this action, and I think that conduct is irrelevant because it opens up the door to a trial within a trial, and the only two people who know about it or have any information is [*sic*] those two. . . . I don't see how that's relevant to a consent defense or any other defense . . . [and] it's completely prejudicial and irrelevant."

The court said it had concerns about the admission of the evidence under section 352, "in light of how long ago it was, the remoteness, and several other factors," and took the matter under submission. Before jury selection began, the court returned to the issue. It tentatively ruled the evidence of any incident between Jane Doe and Daniel was "irrelevant," "that it's too remote," and "under those grounds and under [section] 352," was inadmissible. The court stated it would reconsider its ruling if the circumstances changed. They did not, and Daniel did not testify.

8

Appellant contends the court prejudicially erred in excluding Daniel's testimony, arguing "[a] prior false accusation of sexual molestation is relevant to the victim's credibility."

However, appellant did not make this argument in the trial court. Nor did he offer evidence to show Jane Doe had ever falsely accused Daniel. Instead, when asked by the court how Daniel's testimony would be relevant, defense counsel stated it was to show that both appellant and Daniel were touched inappropriately by Jane Doe: "There will be testimony from [appellant] that essentially the same thing took place between" him and Jane Doe as had occurred between Daniel and Jane Doe.[8] This evidence was therefore offered to show Jane Doe's *character*, not to impeach her *credibility*. Appellant's claim the court erred in excluding evidence of a prior false accusation of sexual misconduct is therefore groundless because no such evidence was offered, let alone excluded. It is too late now to come up with a new theory of admissibility that wasn't offered to the trial court.

Even assuming the claim had been made, it still fails on the merits. A court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) "A trial court has broad discretion in determining whether to admit or exclude evidence objected to on the basis of section 352 [citation], and rulings under that section will not be overturned absent an abuse of that discretion [citation]. '[T]he term judicial discretion "implies absence of arbitrary determination, capricious disposition or whimsical thinking."' [Citation.] '[D]iscretion is abused whenever the court exceeds the

---

[8] Defense counsel similarly suggested Jane Doe's apparent proclivity for sexual activity with her younger brothers was relevant to "a context in which to appreciate how we could have consent," and a "jury would be able to appreciate how something like this could happen today." Again, however, this was a non-impeachment theory of admissibility.

9

bounds of reason, all of the circumstances being considered.' [Citation.]" (*People v. Mullens, supra,* 119 Cal.App.4th at p. 658.)

In exercising its discretion to exclude prior conduct under section 352, a court may consider its remoteness, the dissimilarity of the prior and current conduct, and the degree of certainty of its commission. (*People v. Story* (2009) 45 Cal.4th 1282, 1295.) Similarly, conduct that was "remote, inflammatory and nearly irrelevant and likely to confuse the jury and distract it from the consideration of the charged offenses" strongly weighs in favor of exclusion. (*People v. Harris* (1998) 60 Cal.App.4th 727, 741.) Thus, a court does not exceed the bounds of reason by excluding evidence where the connection between the proffered evidence and the ultimate inference to be drawn from it is tenuous or is so remote that any relevance is at best minimal. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 664.)

This is such a case. The alleged incident occurred over 30 years before, when Jane Doe was a preteen and Daniel was a child. It allegedly happened in Mexico, but there were no records and no evidence law enforcement was ever involved. Indeed, there was no corroborating evidence for either version of the story. The trial court was well within its discretion to preclude a mini-trial on a decades-old collateral incident between children in which appellant was not involved.

Moreover, the consent defense theory of admissibility aside, as to introducing Daniel's testimony to impeach Jane Doe's credibility given her denial the incident occurred, trial courts also have "wide latitude to restrict" questioning and the presentation of evidence "unless the defendant can show the prohibited [questioning] would have produced a *significantly different* impression of the witness's credibility." (*People v. Brady* (2010) 50 Cal.4th 547, 560, italics added.) Here, appellant has made no such showing. Indeed, appellant's own admissions bolstered Jane Doe's credibility far beyond any limited impeachment value found in Daniel's proffered testimony. In sum,

10

the trial court's ruling was in no way arbitrary or capricious, and was not an abuse of discretion.

Finally, even assuming the trial court erred in excluding Daniel's testimony, it was harmless because it was not reasonably probable a more favorable result would have occurred had it been admitted. (*Watson, supra,* 46 Cal.2d at p. 836; cf. *People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1317 [under *Watson*, proposed impeachment testimony was not critical, and its erroneous exclusion did not preclude defendant from presenting a defense based on victim's lack of credibility].) This 30-year-old factually disputed incident involving two children had marginal, if any, relevance to the charges in this case. Although the trial was in some ways a credibility contest between Jane Doe and appellant, appellant's independent admissions in the text messages, cold calls, and his recorded face-to-face meeting with Jane Doe were more than sufficient to take the evidence beyond a mere "he-said, she-said" situation. Furthermore, appellant's testimony seriously strained credulity. We are convinced the outcome in this case would not have been meaningfully affected by introduction of this evidence.

### Elizabeth's Statement to Irma Via a Police Witness

Detective Leticia Hernandez was the main investigating officer in the case and testified to the details of her investigation as well as some of her interviews of the family members. During cross-examination, defense counsel asked Hernandez about what Irma had told her regarding a conversation she had with Elizabeth. The prosecutor objected on hearsay grounds and the court sustained the objection.

At a sidebar conference, defense counsel contended a hearsay exception existed to show Elizabeth's "state of mind" on January 4, when Irma talked to her about a supposed "plan that [Elizabeth] put together with [Jane Doe]" to frame appellant *before* the actual January 13 incident. As a result, counsel argued Irma's hearsay statement to Detective Hernandez as to what Elizabeth had said should be admitted. The court was

11

not persuaded, and aptly observed "anything attached to Elizabeth that comes through Irma . . . would be hearsay." Defense counsel responded he would "just wait," presumably meaning until he called Irma to the witness stand during the defense case, which he later did, and where Elizabeth's entire conversation with Irma was admitted without objection.

The "state-of-mind" exception to the hearsay rule embraces "evidence of a statement of the *declarant's* then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health)" when it is offered to prove the declarant's state of mind, but only when the *declarant's* state of mind either "is itself an issue in the action," or it "explain[s] acts or conduct of the *declarant*." (§ 1250, subds. (a)(1) & (2), italics added.)

And therein lies the problem: defense counsel sought to introduce *Irma's* statements to Detective Hernandez under section 1250, not *Elizabeth's*. Regardless of whether *Elizabeth*'s state of mind may have been relevant to show a supposed conspiracy between Elizabeth and Jane Doe to frame appellant, and Elizabeth's hearsay remarks to Irma were thereby admissible under section 1250, *Irma*'s hearsay statements to Detective Hernandez about what Elizabeth said were not, because *Irma*'s state of mind was irrelevant.[9]

"Multiple hearsay may not be admitted unless there is an exception for each level" of hearsay (*People v. Sanchez* (2016) 63 Cal.4th 665, 675), and defense counsel offered no additional hearsay exception for Irma's statements to Detective Hernandez.

_____

[9] Counsel did not argue for an alternative non-hearsay theory of admissibility. Now, for the first time on appeal, appellant summarily asserts Elizabeth's statements to Irma to Hernandez were admissible, not for the truth of the matter, but instead for the supposedly non-hearsay purpose of showing *Jane Doe*'s "state of mind." He does not explain how the bare fact that Elizabeth had talked to Irma, but not what it was Elizabeth said, would somehow establish Jane Doe's state of mind, let alone Elizabeth's. He provides no argument or authority in support of this odd contention, and we need not consider it further.

12

Simply put, the trial court did not err because it correctly found Irma's statement to Hernandez about what Elizabeth had said to her was inadmissible multiple hearsay.[10]

*Appellant's Immigration Status*

As stated, Irma testified that a few days before appellant's arrest, Elizabeth had told her that "soon" she "wouldn't have to worry about [appellant] anymore." And when asked by defense counsel why she would have to "worry" about appellant in the first place, Irma explained she had "signed as a cosigner for him on a previous occasion."

In a sidebar conference, the prosecutor insisted defense counsel had "opened a door" to further inquiry regarding the details of Irma's "cosigner" relationship with appellant. Defense counsel explained to the court appellant was "seeking asylum in the United States, so in order for him to be out of custody he needs to pay a bond and have someone sponsor [him], so that's what [Irma and Daniel] have signed for." The court asked, "They are a sponsor of the defendant by virtue of his seeking asylum?" Defense counsel replied, "Correct. It's not anything penal."

The prosecutor noted that Irma's "worry" about appellant's asylum petition bond was odd because at that point appellant had not yet been arrested for anything. She insisted she should be able to cross-examine Irma about the timing of her conversation with Elizabeth because Elizabeth had previously testified the "cosigner" conversation had happened *after* appellant's arrest. Moreover, Irma's "worry" also suggested Irma was biased because she had a financial interest to protect predicated on appellant not violating the terms of his release on bond in the asylum matter. The court ruled the "door's been opened," but only "cracked," and only for a limited purpose. And because evidence had already been introduced with reference to Jane Doe's immigration status, the court

---

[10] Even were we to assume the trial court erred in its ruling, it was also not prejudicial because Irma subsequently testified to Elizabeth's statements.

13

concluded any concerns about immigration evidence could be best addressed in the jury instructions.[11]

Returning to her cross-examination, the prosecutor confronted Irma with the timing of her conversation with Elizabeth regarding her "worry" about appellant.

"[Prosecutor]: [Y]ou told [Elizabeth] you were worried about [appellant] since you were his *immigration sponsor*; Correct? (Italics added.)

"[Irma]: Because I had signed for him.

"[Prosecutor]: You were responsible for him?

"[Irma]: Yes.

"[Prosecutor]: Because if he got in any kind of trouble you would lose money?

"[Irma]: Yes, and they were going to come and look for me.

"Prosecutor]: And that could be any kind of trouble, drinking too much, being drunk in public, theft, assault, murder, any trouble; Correct?

"[Irma]: Anything."

Focusing on why it was that Irma would be worried since the conversation with Elizabeth had supposedly occurred before appellant's arrest, the prosecutor continued:

---

[11] The topic of immigration status had been discussed at length before trial. Everyone acknowledged that appellant, Jane Doe, "as well as probably many other witnesses [were] undocumented." The court's position was that immigration status was irrelevant and it had no intention of allowing it to be brought up unless the parties requested it. (Cf. § 351.4.) Even so, Jane Doe had testified she was telling the truth, and was not trying to obtain citizenship through the U-Visa program. The court also allowed defense counsel to cross-examine her about her immigration status and she admitted she was in the country illegally. The parties had stipulated that "The U-Visa is a United States visa which is set aside for victims of crimes and their immediate family members who have suffered substantial mental or physical abuse while in the United States and who are willing to assist law enforcement and government officials in the investigation or prosecution of the criminal activity. [¶] It permits such victims to enter or remain in the United States when they might not otherwise be able to do so." They further stipulated Jane Doe had not at that point requested U-Visa certification. (See generally 8 C.F.R. § 214.14 (2018).) Other than Brandon and Detective Hernandez, all the trial witnesses were Spanish-speaking and assisted by interpreters. The texts, cold calls, and the face-to-face meeting between Jane Doe and appellant were in Spanish, and the jury used translated transcripts. Finally, the jury was also aware the incident from 24 years ago, the memory of which was supposedly triggered in appellant's mind the night of the charged offenses, had occurred in Mexico. In other words, nothing singled out appellant's immigration status in such a way as to unduly prejudice him in the eyes of the jury.

"[Prosecutor]:  You were worried because you hadn't heard from him at that point when you had this conversation with Elizabeth?

"[Irma]:  No.  I hadn't heard anything bad about him.

"[Prosecutor]:  But not anything good either?

"[Irma]:  I had seen him and everything, but nothing bad, normal.

"[Prosecutor]:  Why were you worried?

"[Irma]:  If anything would happen.  I want everything to be going well the way the law required.  I didn't want anything to result bad.

"[Prosecutor]:  And the[m] coming to look for you?

"[Irma]:  Yes, that's true."

This was the extent of the evidence the prosecutor elicited regarding appellant's immigration status.  Appellant now argues the trial court prejudicially erred by allowing this brief exchange between the prosecutor and Irma regarding her cosigner relationship with appellant in which the prosecutor used the term "immigration sponsor" once.  We are not persuaded.

First, appellant did not contest the trial court's decision or object to the prosecutor's cross-examination.  Neither during the sidebar conference, nor later during Irma's testimony, did defense counsel object to the court's door-opening ruling or to the prosecutor's narrow cross-examination of Irma regarding the cosigner issue.  In such circumstances, the issue is forfeited on appeal.  (*People v. Gomez* (2018) 6 Cal.5th 243, 286; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 81-82; see also § 353, subd. (a).)

Appellant seeks to avoid forfeiture by claiming "the defense counsel object[ed] and voice[d] his concerns about admission of immigration status at the sidebar."  Not so.  The reporter's transcript passage appellant cites in support of this erroneous contention instead shows trial counsel's only contribution to the sidebar conference was to provide the court with background information regarding appellant's

15

asylum proceedings and explain Irma and Daniel's role in posting a bond on appellant's behalf.   No objections were lodged.

Forfeiture notwithstanding, it was appellant who raised the topic of his pending asylum petition by asking Irma why she was worried.  In addition, he did not ask the court to narrow the prosecutor's cross-examination by tailoring any evidence of Irma's potential financially-based bias strictly to her cosigner status, without revealing its underlying details.  But more importantly, the prosecutor's cross-examination of Irma was fair, brief, and limited in scope, and was designed solely to impeach her credibility by exposing her financial bias.

Moreover, the jury was instructed with a modified version of CALCRIM No. 200, and told they could not "let bias, sympathy, prejudice, or public opinion influence your decision.  Bias includes . . .  bias for or against the witnesses, attorneys, defendant or alleged victim, based on . . . *immigration/citizenship status*."  (Italics added.)  We presume the jury followed the court's instructions (*People v. Martinez* (2010) 47 Cal.4th 911, 957), and appellant has provided nothing to rebut that presumption.  We conclude that permitting the prosecutor to narrowly cross-examine Irma in the manner she did was not prejudicial, because it is not reasonably probable a more favorable result would have occurred had she been prevented from doing so. (*Watson, supra*, 46 Cal.2d at p. 836.)

For the first time in his reply brief, appellant suggests *we* "should find the potential prejudicial effect of [appellant's] immigration status" necessarily outweighed the probative impeachment value of Irma's "concern" over the fact "she was his immigration sponsor."

16

Aside from the fact we do not entertain points raised for the first time in a reply brief (*Abatti v. Imperial Irrigation Dist.* (2020) 52 Cal.App.5th 236, 297),[12] appellant also fundamentally misconstrues the nature of our review. His apparent, but uncited, reliance on section 352 for weighing prejudice against probative value should have been raised in the first instance in the trial court. A failure to do so results in forfeiture on appeal. (See *People v. Harrison* (2005) 35 Cal.4th 208, 230-231 ["To preserve a claim that a trial court abused its discretion in not excluding evidence under . . . section 352, 'a party must make a *timely and specific objection when the evidence is offered*.' [Citation.]" (Italics added.)].) Thus, appellant's newly-minted contention that we as a reviewing court should now balance the probative value of Irma's testimony regarding her "cosigner" involvement in appellant's asylum petition against its prejudicial effect is both procedurally improper as well as forfeited.

DISPOSITION

The judgment is affirmed.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.

---

[12]     For purposes of this rule, "[a]n issue is new if it does more than elaborate on issues raised in the opening brief or rebut arguments made by the respondent in respondent's brief." (*American Indian Model Schools v. Oakland Unified School Dist.* (2014) 227 Cal.App.4th 258, 275-276; see also Cal. Rules of Court, rule 8.216(b)(3) ["A party must confine a reply brief . . . to points raised in its appeal"].) Appellant's new prejudice versus probative value argument is such an issue.

17