Filed 2/8/24  P. v. Ortega CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RUBEN ORTEGA,<br><br>    Defendant and Appellant. | D081153<br><br><br>(Super. Ct. No.  SCN412267) |


APPEAL from a judgment of the Superior Court of San Diego County, Kelly C. Mok, Judge.  Judgment affirmed.

Pauline E. Villanueva, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Melissa Mandel, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Over an eight-year period, Ruben Ortega sexually abused Jane Doe, the daughter of his then live-in girlfriend (Mother).  A jury found him guilty of

the 30 counts alleged against him.[1]  The court sentenced Ortega to two consecutive indeterminate terms of 15 years to life for counts seven and eight and a total of 93 years in prison on the remaining charges.  On appeal, Ortega argues the evidence does not support the forcible sex offenses (counts 1 through 29) because insufficient evidence shows he committed these offenses by means of force, fear, menace, or duress.  Viewing the evidence in the light most favorable to the judgment, we conclude substantial evidence supports these counts.  Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 2009, Mother lived in Carlsbad with Jane Doe and Doe's younger sister.  Ortega moved into the home in 2011 or 2012, when Jane Doe was around 11 years old.

The first act of abuse occurred when Jane Doe was 11 years old. Ortega entered her room when Mother was away from the home and touched Jane Doe's vaginal area over her underwear with three fingers in a circular motion.  Jane Doe did not say anything to Ortega when he started touching her vaginal area because she "was in shock and uncomfortable" with him doing that to her.  She felt like she could not tell Ortega to stop because she was "just scared as anything."

---

[1]    All undesignated statutory references are to the Penal Code.  The 30 counts were based on the "first" and "last" time each type of offense occurred, based on Jane Doe's age and consisted of:  six counts of forcible lewd act upon a child (counts 1 through 6; § 288, subd. (b)(1)); two counts of aggravated sexual assault of a child (counts 7 and 8; § 269 subd. (a)); eight counts of forcible rape (counts 9, 10, 15, 16, 19, 20, 24, 27; § 261, subd. (a)(2)); nine counts of forcible oral copulation (counts 11 through 14, 17, 18, 21, 22, and 25; former § 288a, subd. (c)(2)(A)); three counts of sodomy by use of force (counts 23, 26, 29; § 286, subd. (c)(2)(A)); one count of forcible oral copulation (count 28, § 287, subd. (c)(2)(A)); and one count of harmful matter sent to a minor with intent to seduce (count 30; § 288.2, subd. (a)).

Another incident occurred when Ortega had Jane Doe alone in the home and he "forced" her to stay in her room, remain quiet, and lay down. After she laid down, Ortega touched her vaginal area and then penetrated her over her underwear with his penis as she cried in silence. More than twice, when Jane Doe was 12 years old, Ortega touched her vaginal area over her underwear with his penis when Mother napped or was away from the home.

When Jane Doe was 13 years old, Ortega "started to take off [her] underwear and penetrate [her] with his penis and force his body on [her]" until he ejaculated. Ortega had sex with her more than twice when she was 13 years old. After Jane Doe turned 14, Ortega touched her vagina with his hand and penetrated her with his hand and penis. When no one else was home, Ortega "would tell [her] to stand in the middle of the hallway and leave [her] shirt on but take off [her] underwear and just turn around slowly, and that's what [she] did. And he would make [her] go [in Mother's] room and [she] would just lay on [her] stomach and just not move. Then he would just penetrate [her from behind] with his penis." This happened almost every time Ortega was alone with Jane Doe.

After Jane Doe turned 15 years old, Ortega "would force [her] to . . . give him oral sex and force [her] head onto his penis until he ejaculated into [her] mouth. He would make [her] try to swallow it." This happened many times in the living room, kitchen, Mother's bedroom, or her bedroom. Ortega also penetrated Jane Doe's vagina with his penis more than twice. Ortega also started giving Jane Doe alcohol and marijuana. When she turned 16, Ortega continued to have sex with Jane Doe. This happened more than once in a minivan, the kitchen, living room, or Mother's room. Ortega also

frequently made Jane Doe orally copulate him. Ortega also sodomized Jane Doe.

When Jane Doe turned 17, Ortega started to orally copulate her. He continued to force Jane Doe to orally copulate him and continued having intercourse with her "all over" the family home including the garage. After Jane Doe turned 18 the sexual intercourse continued until three weeks before her 19th birthday. Jane Doe stated she smoked marijuana "because [she] wanted to forget everything and not feel anything physically." She claimed she was "addicted to marijuana because I just was numb physically and mentally."

Three weeks before her 19th birthday Jane Doe was texting a male friend. When Ortega saw the text, he spat in front of her face and demanded she give him the phone. He told her to get in the car and then "started getting mad at [her] out of control" and balled his hand in front of her face as if he was going to punch her. The next day Jane Doe packed her belongings and had her Father pick her up. She left because she had enough "Of all the pain that it caused [her] from the beginning. [She] just felt reckless of [her] own body and . . . couldn't handle it anymore."

Eventually, Jane Doe told one of her cousins about the abuse. Jane Doe's aunt then called Doe who "finally broke down" and told her aunt what had happened. Father overhead the conversation and Jane Doe told Father about the abuse. They called the police and went to the police station that night. The following day, a police detective interviewed Jane Doe for at least three hours. The detective opined that Jane Doe was not cognitively impaired. He noticed, however, that when talking to Jane Doe "she may not necessarily be processing exactly what you're saying in the moment" and he would sometimes need to say things a couple times or in different ways. As

4

an example of this, when asking Jane Doe whether Ortega used force, she might say "no." Other times when he asked about Ortega using force "she would explain and describe [Ortega] using force. For example, 'I would say "no" and he would just go for it' or 'he would continue until he ejaculated' or 'I would try and push him off and he would force me to keep going for a little bit,' and that was kind of her response."

DISCUSSION

I.

*Standard of Review*

In reviewing the sufficiency of the evidence, "we must ' "review the entire record in the light most favorable to the judgment," ' and then determine whether it contains ' "evidence that is reasonable, credible, and of solid value" ' such that a reasonable jury could have found the defendant guilty beyond a reasonable doubt." (*People v. Ware* (2022) 14 Cal.5th 151, 167.) We "presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence." (*People v. Medina* (2009) 46 Cal.4th 913, 919.) "Although circumstances might also reasonably be reconciled with a contrary finding, it does not warrant reversal of the judgment. [Citation.] All intendments are in favor of the judgment and a verdict will not be set aside unless the record clearly shows that there is not sufficient evidence based upon any hypothesis whatsoever. [Citation.] Defendant bears an 'enormous burden.' " (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1071.)

II.

*Substantial Evidence Supports All Counts*

Ortega's convictions for the forcible sex offenses (counts 1 through 29) required that the jury find he committed the offenses by "force, violence,

duress, menace, or fear of immediate and unlawful bodily injury." (§§ 269 subd. (a), 288, subd. (b)(1), 261, subd. (a)(2), former 288a, subd. (c)(2)(A), 286, subd. (c)(2)(A).) Because the statutory language is in the disjunctive, a conviction may be supported by evidence of any one of the listed factors. (See *People v. Young* (1987) 190 Cal.App.3d 248, 259.) The People prosecuted the case on the theory Ortega committed the offenses by means of duress.

The instructions defined duress as "the use of a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to cause a reasonable person to do or submit to something that he or she would not otherwise do or submit to. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the child and her relationship to the defendant." (CALCRIM Nos. 1111, 1000, 1015, 1030.) Other pertinent factors include threats to harm the victim, physically controlling the victim, and warning the victim that revealing the molestation would jeopardize the family. (*People v. Cochran* (2002) 103 Cal.App.4th 8, 14 (*Cochran*), overruled on another point in *People v. Soto* (2011) 51 Cal.4th 229, 248, fn. 12 (*Soto*).) "Physical control can create 'duress' without constituting 'force.'" (*People v. Shulz* (1992) 2 Cal.App.4th 999, 1005 (*Shulz*).) That an appellant does not use force or overt threats does not prevent a finding of duress because the victim's testimony should be considered in light of her age and relationship to the appellant. (*Cochran*, at p. 14.) "[T]he legal definition of duress is objective in nature and not dependent on the response exhibited by a particular victim." (*Soto*, at p. 246.)

We disagree with Ortega's contention that his convictions for the forcible sex offenses must be reversed because there was insufficient evidence of duress. Although Jane Doe never saw Ortega as a father figure, Mother described him as a partner or spouse responsible for her children's safety and

6

wellbeing when she was not home.  Ortega was 19 years older and larger than Jane Doe, and she described him as "super strict."  Jane Doe had attention deficit hyperactivity disorder and experienced difficulties in the areas of speech development, learning processes and comprehension.  Ortega knew Jane Doe had learning disabilities.  Mother described Jane Doe as "very shy, very gullible, just a little la-la land" and as someone who "wouldn't talk back."  Ortega stated Jane Doe "likes to keep to herself and [is] very quiet."  When asked if Jane Doe was easily manipulated, Ortega responded, "If you tell her something, she believes it."  The detective in charge of the investigation similarly described Jane Doe as "very timid and soft spoken, seemingly shy."  The jury could reasonably infer from these circumstances that shy and young Jane Doe perceived Ortega as an authority figure whose directions to her were not requests but orders to be followed.

The record shows Ortega continuously molested Jane Doe over an eight-year period beginning when she was 11 years old and that the molestation occurred in their family home and outside the home when Ortega had Jane Doe alone.  During the first act of abuse, Jane Doe described being "really scared" and "in shock" when Ortega entered her room and touched her vaginal area over her underwear with his fingers.  Jane Doe was too scared to tell him to stop and believed Mother would yell at her.

For the next incident, Ortega "forced" Jane Doe to stay in her room, remain quiet and lay down before he again penetrated her over her underwear with his penis.  Ortega later told Jane Doe to not tell anyone.  He told her, "This is our little secret.  You better not tell your mom or else she's going to do something and probably call CPS on us."  She believed Ortega and did not tell anyone what he had done to her.  At the time, Jane Doe did not know what CPS stood for but believed someone would take her away from her

7

family. "A simple warning to a child not to report a molestation reasonably implies the child should not otherwise protest or resist the sexual imposition." (*People v. Senior* (1992) 3 Cal.App.4th 765, 775.)

Ortega groomed Jane Doe to accept the abuse, starting with touching her vaginal area with his penis over her underwear, to increasingly more severe sex acts as she grew older. Jane Doe's testimony shows Ortega psychologically dominated her as an adult authority figure. When she was 13 years old, Jane Doe felt she could not tell anyone what was happening, stating: "I was just shutting down at that point. I just felt like I couldn't trust anybody. I felt numb." At age 14, Jane Doe described feeling as if "I wasn't a part of my body. I felt like he owned my body and would force me to have sex with him."

When Jane Doe turned 15, Ortega increased the psychological pressure on Doe by telling her that he preferred spending time with her rather than Mother. This made Jane Doe uncomfortable and she did not tell Ortega that she did not want to spend time with him "because [she] was afraid of what he would do to [her]." Jane Doe described how Ortega "force[d] [her] to act like . . . [she] was in a relationship with him." This psychological pressure included telling Jane Doe he loved her, did not want her to leave him, and how he did not love Mother. Jane Doe stated this was "[v]ery confusing" to her. When asked what she thought when Ortega stated he loved her, Jane Doe responded, "I wanted to commit suicide and just not be in the family no more. Just run away. I didn't want to live anymore."

Throughout her high school years, Jane Doe did not want to be in a relationship with Ortega and felt like he "controlled" her. When asked how Ortega controlled her, Jane Doe responded: "He would get mad at me if I would talk to my dad over the phone or go visit him, or if I were to go and try

8

to hang out with some of my friends, and he would try to manipulate me into staying home.  Or he would get mad at me every time I go visit my family on my dad's side or -- yeah.  Simply as going on a walk."  Ortega also spent a lot of time having conversations with Jane Doe about being in a relationship, which "confused" and "scared" Doe and caused her to be "just numb most of the time."

Jane Doe smoked marijuana "because [she] wanted to forget everything and not feel anything physically."  By the time she was 18 years old, Jane Doe described being "addicted to marijuana because I just was numb physically and mentally."  Ultimately, Jane Doe left the family home because she had enough "[o]f all the pain that it caused [her] from the beginning. [She] just felt reckless of [her] own body and just . . . couldn't handle it anymore."

In addition to psychological pressure, Ortega exhibited physical control over Jane Doe, which can create duress without constituting force.  (*Shulz, supra*, 2 Cal.App.4th at p. 1005.)  Jane Doe consistently testified that Ortega "forced" her to participate in the sex acts and that her fear caused her to acquiesce to Ortega's advances.  When Ortega first molested her, Jane Doe described being "scared," "in shock" and "afraid to move."  During another incident, Ortega "forced" Jane Doe to stay in her room, remain quiet and lay down.  Once, Ortega used his hands to move Jane Doe's body into different positions.  For oral sex, Jane Doe stated Ortega forced her head onto his penis.  She described how Ortega put his hand on the back of her head until he ejaculated and once when she tried to pull away Ortega "forced" his penis into her mouth.  Jane Doe also believed Ortega would hit her, stating:  "He would not lay a finger on me, but it just felt like he would threaten me, and his tone of voice when he would get mad at me every time I at least tried to

9

say no about having oral -- my mouth and his penis.  It just felt like I couldn't say no to him.  [He would] [j]ust manipulate my mind."

Relying on *People v. Espinoza* (2002) 95 Cal.App.4th 1287 and *People v. Hecker* (1990) 219 Cal.App.3d 1238[2], Ortega asserts duress requires more than mere psychological coercion or manipulation and must include evidence of an implied threat of force, violence, danger, hardship, or retribution. (*Hecker*, at pp. 1250–1251.)  Several courts have rejected this argument that psychological coercion without more does not establish duress.  In *Cochran*, *supra*, 103 Cal.App.4th 8, the same court that decided *Hecker* declined to follow it, finding its language to be overly broad.  The *Cochran* court explained:  "The very nature of duress is psychological coercion.  A threat to a child of adverse consequences, such as suggesting the child will be breaking up the family or marriage if she reports or fails to acquiesce in the molestation, may constitute a threat of retribution and may be sufficient to establish duress, particularly if the child is young and the defendant is her parent.  We also note that such a threat also represents a defendant's attempt to isolate the victim and increase or maintain her vulnerability to his assaults."  (*Cochran*, at p. 15; accord, *People v. Veale* (2008) 160 Cal.App.4th 40, 49 [" '[D]uress involves psychological coercion.' "]; *People v. Mejia* (2007) 155 Cal.App.4th 86, 101 [warning victim not to report incidents "bespeaks psychological coercion, not normal sexual relations"].)  Additionally, the Supreme Court later approved a definition of duress in child molestation cases consistent with *Cochran*, describing duress as " 'us[ing] some form of

---

2      *Hecker* overruled in part in *Soto*, *supra*, 51 Cal.4th at page 248, footnote 12.

10

psychological coercion to get someone else to do something.' " (*Soto, supra*, 51 Cal.4th 229 at p. 243.)

"We 'must accept logical inferences that the [factfinder] might have drawn from the circumstantial evidence. [Citation.]' . . . Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357–358.) Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that Ortega took advantage of his authoritative position and Jane Doe's timidity, age, and vulnerability. The jury could also reasonably conclude, based on the totality of the circumstances, that Jane Doe's acquiescence was derived from the psychological and physical control Ortega exercised over her and was not the result of freely given consent. In summary, substantial evidence supports the jury's implied finding of duress. Thus, we reject Ortega's substantial evidence challenge to the forcible sex offenses.

DISPOSITION

The judgment is affirmed.

DO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

IRION, J.

11