Filed 4/2/26  P. v. Sancho CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>NORBERT RAY SANCHO,<br><br>    Defendant and Appellant. | D087146<br><br><br><br>(Super. Ct. No. RIF1900615) |

APPEAL from a judgment of the Superior Court of Riverside County, Jeffrey Prevost, Judge.  Affirmed.

Rachel Varnell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Chief Assistant Attorneys General, Robin Urbanski and Flavio Nominati, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Norbert Ray Sancho of sexually abusing his stepdaughter, Jane Doe, over the course of several years, and of resisting

arrest. Sancho alleges (1) his convictions should have been dismissed in accordance with *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) because he was deprived at his preliminary hearing of evidence that Doe had previously denied any sexual abuse; (2) there was insufficient evidence to support the jury's findings of force or duress for 13 of his 14 sex crime convictions; and (3) the abstract of judgment incorrectly reflects his presentence custody credits. We affirm, concluding (1) the delayed provision of Doe's prior statement was not prejudicial at trial; (2) there was sufficient evidence to support the challenged sex crime convictions; and (3) the custody credit issue is moot because the trial court provided the requested relief.

FACTUAL AND PROCEDURAL BACKGROUND

Doe lived in Orange County with her mother, sister, and brother. Around the time Doe was four years old, her mother's boyfriend, Sancho, moved in. Doe's mother worked long shifts outside the home, often leaving for work early in the morning "when it was still dark."

Doe's relationship with her mother changed after Sancho moved in. Her mother would drink beer, become "very mean," and yell more. She was "always mad or angry," and she spanked Doe "a lot." Doe's mother would spank her, for example, if Doe did not empty the ashtrays that her mother and Sancho used. Sancho also regularly spanked her and her siblings, using a belt. On one occasion, Sancho woke the children from their beds to spank them. When Sancho spanked Doe, her mother did not stop him and eventually, her mother married Sancho.

Over time, Sancho made a rule that Doe and her sister were no longer allowed to sleep with underwear on because "[i]t needed to be aired." Doe told her mother that she wanted to wear her underwear, but her mother spanked her and told her to follow the rule. She also could not speak to an

2

adult unless they spoke to her first, and Sancho or her mother would spank her if she broke the rule.

a. *Uncharged Sexual Acts in Orange County*

Beginning around the time that Doe was four or five years old, Sancho began touching Doe's vagina with his hand when her mother was not home. With time, this progressed to Sancho touching her vagina with his penis. Doe felt pain in her vagina but did not say anything because she was scared and did not want to get in trouble. Doe knew that she was "not allowed to question an adult." Sancho also made Doe agree not to tell her mother about what he did because "she would not understand the type of love [they had]" and would get very upset.

This abuse occurred for years but less often when Doe's older sister lived in the home. After her older sister ran away, the abuse happened more.

Doe's sister recalled that when Sancho moved in, she was in the fifth grade. Sancho felt that their home was not clean, and there would be times that at 2 or 3 a.m., Sancho would "explode," waking up everyone with his yelling because they weren't cleaning the bathroom or other things. If the children did not clean up, Sancho yelled explosively and disciplined them with a belt or whatever other item he grabbed, such as the handle of a plastic flyswatter. Her mother directed the children to listen to Sancho, including by following his rule for the girls to not wear underwear to bed. When her mother drank beer, she struck them with a belt and had a quick temper. Doe's sister ran away from home sometime after Sancho brought her to his bed and pulled her backside into his erect penis while he laid next to her. Sancho told her "[d]on't tell anyone," and initially, she did not. But after running away, Doe's sister told their mother about Sancho's abuse.

Following Doe's sister's disclosure, an Orange County social worker interviewed Doe. In the interview, Doe denied that anyone had ever done anything to violate her privacy, denying any touching, fondling, or molest by anyone. She stated Sancho had never done anything to her, and moreover, she had told her mother the same thing. She "fe[lt] safe and secure at home." For a while, Doe moved to another city in Orange County to live with her grandmother. Doe's mother continued her relationship with Sancho while Doe's sister lived with other family members for several years.

b. *Charged Sexual Acts in Riverside County*

Around the time Doe was nine or 10 years old, she moved to Riverside County and returned to living with Sancho, her mother, and brother. There, on multiple occasions, Sancho touched Doe's breasts and vagina with his hand in the early morning when her mother was away at work. Doe did not say anything to Sancho and did not try to stop him because "[h]e was still mean," and she "didn't want to get in trouble." Sancho was also bigger than she was. He set the house rules and was "authoritative." He was the person who gave out the consequences, like being grounded to her room and not having telephone or television privileges. Doe wanted to stay at her friend's house overnight because she did not want to be home. Sancho would not abuse her if one of her friends was spending the night or if she spent the night at her friend's house.

While Sancho did not strike her with the belt anymore, on more than one occurrence, he struck her face with his open hand. When Doe was in the sixth grade, she got in trouble because she ran into a male classmate at the park when she took her dog for a walk. Sancho accused her of sneaking away to meet the boy. Doe's mother had to physically intervene because after twice slapping Doe, Sancho kicked her in the ribs fracturing two of them. After her

4

mother separated Sancho from Doe, her mother yelled at her before taking her to receive medical care.

When Doe was 11, she tried once to keep her legs closed when Sancho attempted to touch her, but he overpowered her and opened her legs. He touched her multiple times a week when she was 11 and 12 years old. Then, on her 13th birthday, Sancho put his penis inside her vagina. When this happened, she did not say anything or react. From then through age 16, on multiple occasions each year, Sancho touched Doe's vagina and breasts with his hand and would put his penis in her vagina when she was menstruating. Doe did not fight him off and did not tell her mother.

Doe did not tell her mother because when she was 13 years old, she told a counselor at school that Sancho had been touching her inappropriately. After reporting this, police officers took her home and spoke with her mother. As Doe sat in the police car, she could see the officers speaking to her mother; she saw her mother was mad and already drunk. She knew she "was about to get [her] butt whooped" and did not want to make her mother's anger worse, so she told the officers that "everything [was] fine." After the officers left, her mother hit her in the face with a closed fist more than once, giving her a black eye and a busted lip. Her mother told her that she was a "liar and that [it] didn't happen." Her mother then told Sancho what Doe had said when he got home. Sancho got mad and yelled that she was a "liar." His sexual abuse continued the next morning, and he was more aggressive when he grabbed her. Sancho stopped abusing Doe when she was 17.

As an adult, Doe went to therapy, and she talked to her mother about her memories of being molested by Sancho. Her mother told her to forgive Sancho, and soon after Doe received a letter in Sancho's writing that stated, "God forgave him, so should [she]."

5

Doe reported Sancho's abuse. The Riverside County District Attorney's Office charged the sexual crimes alleged to have occurred in Riverside County as eight counts of committing a lewd or lascivious act by force, violence, duress, menace or fear on a child under 14 years of age (Pen. Code,[1] § 288 (b)(1); counts 1–8); and six counts of sexual penetration by force, violence, duress, menace, or fear (§ 261, subd. (a)(2); counts 9–14). Sancho was also charged with resisting a police officer (§ 148, subd. (a)(1); count 15).[2] A jury convicted Sancho of all charges. The trial court sentenced him to a total term of 84 years in prison.

DISCUSSION

I.

*Motion to Dismiss*

A. *Additional Background*

Prior to Sancho's trial, the court conducted a preliminary hearing for the allegations in Riverside County. The court received evidence of Doe's allegations of abuse, including her statement made in Riverside County that she told a school counselor about Sancho's abuse but then later told the police officers everything was fine. The court found there was sufficient evidence to believe the charged offenses were committed by Sancho.

After the preliminary hearing and before trial, the prosecution petitioned the Orange County Superior Court for access to its juvenile records. The prosecution received responsive records on July 15, 2021, and produced them to the defense the next day. Included within the records was

---

[1] Further undesignated statutory references are to the Penal Code.

[2] Sancho's conviction for resisting a police officer is not specifically at issue on appeal.

Doe's interview with the Orange County social worker, wherein she denied any abuse by Sancho.

Sancho moved to dismiss the case under *Brady, supra*, 373 U.S. 83. The court denied Sancho's motion, finding no reasonable probability of a different outcome at the preliminary hearing had the Orange County interview been disclosed prior to that hearing.

Trial began almost three years after the prosecution provided the Orange County interview to Sancho. Sancho's defense attorney cross-examined Doe regarding the interview and elicited Doe's childhood statements via testimony from the social worker.

B. *Analysis*

Sancho argues his convictions must be reversed because the People failed to disclose Doe's Orange County Social Services interview before the preliminary hearing and had he been able to introduce both of Doe's prior inconsistent statements—her Orange County statement and her Riverside County statement—he would have had more persuasive evidence that Doe fabricated her allegations. We need not decide whether a *Brady* violation occurred because even if we were to assume such a violation occurred, Sancho cannot show that it prejudiced him at trial.

A criminal defendant has a due process right to pretrial discovery of information favorable to his defense. (*Brady, supra*, 373 U.S. at p. 87.) The defendant's right to this discovery applies at the preliminary hearing stage. (*Bridgeforth v. Superior Court* (2013) 214 Cal.App.4th 1074, 1081.) Under this right, the government has a constitutional duty to disclose both exculpatory evidence that casts doubt on the defendant's guilt and impeaching evidence that calls into question the credibility of government witnesses. (*Strickler v. Greene* (1999) 527 U.S. 263, 280 (*Strickler*).)

7

A *Brady* violation occurs when evidence is not disclosed to the defendant that is:  (1) "favorable to the [defendant], either because it is exculpatory, or because it is impeaching," (2) "suppressed" by the government "either willfully or inadvertently," and (3) material.  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176 (*Letner and Tobin*); *Strickler, supra*, at pp. 281–282.)  "Evidence is 'favorable' if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses.  [¶]  Evidence is 'material' 'only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different.'  [Citations.]  The requisite 'reasonable probability' is a probability sufficient to 'undermine[ ] confidence in the outcome' on the part of the reviewing court."  (*In re Sassounian* (1995) 9 Cal.4th 535, 544.)

Because a *Brady* violation is predicated on materiality, it generally requires reversal without the need for harmless error review.  (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1133, overruled in part on other grounds, citing *Kyles v. Whitley* (1995) 514 U.S. 419, 437.)  But on appeal, a different standard applies for review of alleged errors at a preliminary hearing.  Errors at a preliminary hearing that "are not jurisdictional in the fundamental sense . . . require reversal only if defendant can show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination."  (*People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529; see *People v. Carrington* (2009) 47 Cal.4th 145, 178 ["Generally, a conviction will not be reversed because of errors or irregularities that occurred at a preliminary hearing . . . , absent a showing that the asserted errors 'deprived [the defendant] of a fair trial or otherwise resulted in any actual prejudice relating to [the] conviction.' "].)  A *Brady* violation at a preliminary hearing is not jurisdictional in the fundamental sense.  (See *Letner and Tobin, supra*,

50 Cal.4th at p. 139 [" '[A] lack of jurisdiction in its fundamental or strict sense results in " 'an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties.' " ' "].)  Thus, Sancho must demonstrate he was prejudiced at trial by the delayed disclosure of the Orange County interview.

Sancho fails to show prejudice at trial because the prosecution disclosed the Orange County interview almost three years before trial, and at trial, the defense introduced Doe's Orange County statements as evidence.  The defense cross-examined Doe regarding her statements in the interview and called the social services worker to testify regarding those statements.  After the presentation of this evidence at trial, the jury convicted Sancho of each crime beyond a reasonable doubt.  Thus, Sancho cannot show that any *Brady* violation before the preliminary hearing prejudiced him at trial.

II.

*Evidentiary Sufficiency*

Sancho avers that except for one of the lewd or lascivious acts when he forcibly separated Doe's legs, the evidence was insufficient to demonstrate force or duress for the charged sexual crimes.  Reviewing the record in the light most favorable to the judgment, we disagree.

" 'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]  Reversal on this ground is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Veale* (2008) 160 Cal.App.4th 40, 45.)  Accordingly, the "defendant bears an enormous burden in claiming there is

9

insufficient evidence to sustain his molestation convictions," and "[i]f the verdict is supported by substantial evidence, we are bound to give due deference to the trier of fact and not retry the case ourselves." (*Id*. at p. 46.)

The court instructed the jury to find Sancho guilty of committing lewd and lascivious acts by force or fear on a child under the age of 14 years, as charged in counts 1–8, the People must prove, among other things, that in committing the act, Sancho "used force, violence, duress, or fear of immediate and unlawful bodily injury to [Doe] or someone else." Similarly, the court instructed that to find Sancho guilty of committing rape by force, as charged in counts 9–14, the People must prove, among other things, that Sancho "accomplished the intercourse by force, violence, duress, or fear of immediate and unlawful bodily injury to [Doe]."

To find a defendant used duress, there must be " 'a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' " (*People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1319 (*Espinoza*).) In analyzing whether the defendant used duress, we look at "[t]he totality of the circumstances includ[ing] the victim's age, her relationship to the perpetrator, threats to harm the victim, physically controlling the victim when the victim attempts to resist, warnings to the victim that revealing the molestation would result in jeopardizing the family, and the relative physical vulnerability of the child." (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072 (*Thomas*).)

Sancho urges that aside from the singular instance of forcing Doe's legs apart, there was no evidence he used force or duress to commit the remaining charged sex crimes. He asserts his commission of the sexual crimes was "not

10

accompanied by a direct or implied threat of any kind," because while he had previously disciplined Doe, he did not discipline her in relation to the sexual incidents. Sancho's relies on *Espinoza, supra*, 95 Cal.App.4th at p. 1321, wherein the court determined there was no evidence that the defendant utilized any direct or implied threat when he molested his 12-year-old daughter. There, the court explained that while the defendant was the victim's father, was physically larger than her, and she feared him because he had molested her, there was no evidence "that this fear was based on anything defendant had done other than to continue to molest her." (*Ibid.*) Thus, "[i]t would be circular reasoning to find that [the victim's] fear of molestation established that the molestation was accomplished by duress based on an implied threat of molestation." (*Ibid.*)

Unlike *Espinoza*, there was evidence that Doe's fear was based on more than just Sancho's status as her stepfather, larger size, and the fact that he had molested her before. And we find *Thomas* to be informative. In *Thomas*, the defendant sexually abused his daughter between the ages of four and 14 when they were alone at home. (*Thomas, supra*, 15 Cal.App.5th at p. 1067.) Separately, he also scared his daughter by yelling at her and hitting her on her hands or buttocks. (*Ibid.*) For example, the defendant struck his daughter with a belt on her buttocks and the back of her thighs because she got a "D" in Math, and on another occasion, he grabbed her by the neck and kicked her in the buttocks because she did not return 50 cents in change after buying an ice cream. (*Id.* at p. 1068.) The court explained because of her "young age . . . and defendant's position of authority [as her father], she was particularly susceptible to being coerced." (*Id.* at p. 1073.) And "although [she] did not expressly resist her father, [his] ongoing violent conduct terrified [her]. The jury could reasonably have found that his continual

11

beatings constituted an implied threat of violence or danger if she did not submit to his sexual abuse." (*Id*. at p. 1073.)

Here, the jury had evidence that Sancho's control over Doe was omnipresent, and like *Thomas*, he caused Doe to fear him by regularly hitting her for small infractions. Sancho took advantage of Doe's age, beginning to sexually abuse her from the time she was four or five years old. As her stepfather, her mother insisted that she follow his rules. When Doe wanted to wear underwear to bed despite his rule against it, her mother spanked her. Sancho became the disciplinarian of the house, and if Doe did not do as she was told, she would be hit. If she spoke to an adult without first being spoken to, he would spank her. He repeatedly spanked her and her siblings with a belt and struck her face with his hand. When she talked to a male classmate at the park while walking her dog, he slapped her and then fractured two of her ribs by kicking her. When her mother saw Sancho kick Doe in the ribs, Doe's mother yelled at Doe. He controlled whether she could leave her room or use the phone. When she tried to report his abuse at school, her mother's reaction was anger. Her mother beat her with her fists and told Sancho. Sancho was bigger than Doe, got mad at her when she did not do what she was told, and she feared angering him, knowing Sancho abused her only when her mother was away and simultaneously that her mother was unlikely to help her anyway. Doe was conditioned from a young age to "not say anything because she was scared and did not want to get in trouble." Furthermore, the one time she tried to resist by keeping her legs together, he physically controlled her by forcing her legs open. Considering all the circumstances, the jury could reasonably have found Sancho implied to Doe that she must submit to his sexual abuse because he made it clear through his position of authority over her and his repeated acts of hitting her

12

that any resistance would result in more harm.  Thus, substantial evidence supported each of Sancho's convictions in counts 1–14.

III.

*Custody Credits*

At his sentencing, the court awarded Sancho 125 days total custody credit, finding he had 109 days actual custody credit plus 16 days conduct credit pursuant to section 2933.1.

On appeal, Sancho requested this court modify his abstract of judgment because Sancho's number of actual days in custody was miscalculated, resulting in further miscalculation of his conduct credits and total credits. Sancho requested this court amend his abstract of judgment to reflect 114 actual days of custody, plus 17 days of conduct credit, for a total of 131 days custody credit.  Sancho noted he made the same request to the trial court on April 10, 2025, but had not yet received a response.  On April 11, 2025, the trial court granted Sancho's request, awarding him 114 actual days of credit, plus 17 days of conduct credit, for a total of 131 days of custody credit.  The same credits were provided in the abstract of judgment filed on April 14, 2025.  Noting that the trial court awarded Sancho the custody credits he requested, we asked Sancho whether this issue had become moot.  "[A] moot case is one in which there may have been an actual or ripe controversy at the outset, but due to intervening events, the case has lost that essential character and, thus, no longer presents a viable context in which the court can grant effectual relief to resolve the matter."  (*Association of Irritated Residents v. Department of Conservation* (2017) 11 Cal.App.5th 1202, 1222.)

Sancho responded on February 23, 2026, conceding the issue is moot in light of the abstract of judgment filed on April 14, 2025.  Because Sancho has

13

already received the relief he seeks, we need not render an opinion on this issue.  (See *People v. Rish* (2008) 163 Cal.App.4th 1370, 1380.)

DISPOSITION

The judgment is affirmed.


McCONNELL, P. J.

WE CONCUR:


CASTILLO, J.


RUBIN, J.